# EXHIBIT "A"

# TABLE OF CONTENTS

|     |                                                          | PAGE |
| --- | -------------------------------------------------------- | ---- |
| 1.  | Definitions                                              | 1    |
| 2.  | Grant of Franchise                                       | 3    |
| 3.  | Term and Renewal                                         | 4    |
| 4.  | Fees                                                     | 6    |
| 5.  | Financial Information                                    | 8    |
| 6.  | Duties of Franchisor                                     | 9    |
| 7.  | Duties of Franchisee                                     | 10   |
| 8.  | Proprietary Marks                                        | 14   |
| 9.  | Corporate Identity Marketing and Operations Manual       | 16   |
| 10. | Confidential Information                                  | 17   |
| 11. | Transferability of Interest                              | 18   |
| 12. | Default and Termination                                  | 23   |
| 13. | Obligations Upon Termination                             | 26   |
| 14. | Covenants                                                | 28   |
| 15. | Taxes, Permits, and Indebtedness                         | 31   |
| 16. | Independent Contractor and Indemnification               | 32   |
| 17. | Insurance                                                | 33   |
| 18. | Approvals and Waivers                                    | 34   |
| 19. | Notices                                                  | 35   |
| 20. | Entire Agreement                                         | 35   |
| 21. | Severability and Construction                            | 36   |
| 22. | Mediation/Arbitration of Disputes                        | 37   |

C0625-024
58841.5

061198

23.  Applicable Law, Etc . . . . . . . . . . . . . . . . . . .  38

24.  Attorneys' Fees . . . . . . . . . . . . . . . . . . .  38

25.  Survival of Covenants and Conditions  . . . . . . . . .  39

26.  Acknowledgements  . . . . . . . . . . . . . . . . . . .  39

C0625-024
58841.5

061198

## FRANCHISE AGREEMENT

FOR _Memphis, TN_ MSA

THIS FRANCHISE AGREEMENT, made and entered into this _4th_ day of _August_, 19_98_, by and between CHECKCARE ENTER-PRISES, INC., a Georgia corporation, hereinafter referred to as "Franchisor", and _S & D Holdings_, a _Tennessee Limited Liability Company_, hereinafter referred to as "Franchisee";

## W I T N E S S E T H :

WHEREAS, Franchisor has expended time, effort and money to develop and obtain knowledge and expertise in the check collection, check guarantee and check verification business and to develop a unique system relating to the operation of a check collection business, including the methods of marketing and administering said services, all of which may be changed, improved and further developed by Franchisor from time to time (the "System"); and

WHEREAS, Franchisor identifies the System by means of certain service marks, logos and emblems (hereinafter the "Proprietary Marks"), including, but not limited to the service mark "CHECKCARE" and logo and such other service marks and logos as may be designated now or hereafter by Franchisor (in the Manual [as herein defined] or otherwise in writing) for use in connection with the System; and

WHEREAS, Franchisee desires to enter into and operate a check collection business in accordance with the System and wishes to obtain a franchise from Franchisor for that purpose, as well as to receive the training and other assistance provided by Franchisor in connection therewith; and

WHEREAS, Franchisee understands and acknowledges the impor-tance of Franchisor's high and uniform standards of service and operation and the necessity of operating its business in conformity with the System;

NOW, THEREFORE, the parties mutually agree as follows:

1.   <u>Definitions</u>.   In addition to the words and terms elsewhere defined in this Agreement, the following words and terms as used in this Agreement shall have the following meanings unless the context or use indicates another or different meaning or intent;

061198

"Checkcare Security Fund, Inc." shall mean a Georgia corporation wholly owned by Franchisor and administered by a committee of franchisees.

"Checkcare USA" shall mean Checkcare USA, Inc., a Georgia corporation, wholly owned by Franchisor and which provides certain marketing, administration, claims payment and other customer services for the Franchise Business.

"Competing Business" shall mean any person, concern or entity which is engaged in or conducts or plans to engage in or conduct (within the Franchise Area) a business substantially the same as the Franchise Business.

"Confidential Information" shall mean any data or information disclosed to or acquired by Franchisee from Franchisor or as a result of Franchisee's connection with the Franchise Business, and not generally known to or by a Competing Business about the Franchise Business, which shall include, without limitation, the System, together with knowledge and know-how relating to accounting, marketing, check collection, check guarantee and check verification procedures, customer lists, customer account records, training and operations material and memoranda and any other information treated by Franchisor as being confidential or labeled "confidential", as well as all physical embodiments of the foregoing.

"Customers/Clients" shall mean retail and other business-es that contract with the Franchise Business (as defined below) for services approved by Franchisor.

"EFT" shall mean Electronic Funds Transfer, the electron-ic transfer of monies through the Automated Clearing House (ACH) division of the Federal Reserve Bank or such other service provider that causes pre-authorized amounts to be drafted between bank accounts.

"Franchise Area" shall mean the Standard Metropolitan Statistical Area plus, if applicable, certain other geographic areas, all as outlined on Exhibit "A" attached hereto and made a part hereof.

"Franchise Business" shall mean the performance of check collection, check guarantee and check verification services utilizing the System, including, without limitation, Franchisee's marketing and administration of said services and its use of its Proprietary Marks and printed materials.

C0625-024
58841.5

2

"Gross Revenues" shall mean the total revenues received by Franchisee from the Franchise Business, including, but not limited to, all membership fees, service charges, verification charges, net equipment charges, miscellaneous charges, and all other revenues of every kind and nature, but excluding sales or use taxes (but not income taxes) and the customer's share of all returned checks collected and paid by Franchisee.

"Initial Franchise Fee" shall mean the payment due Franchisor pursuant to Paragraph 4(a) below, which fee shall be deemed to be fully earned and non-refundable upon the execution of this Agreement, except as provided in Paragraph 12(a) below.

"Key Account" shall mean any customer or potential customer which requests to be handled by Checkcare USA, or which a Franchisee requests that Checkcare USA handles, and which affects, or potentially affects, two (2) or more Checkcare System offices.

"Manual" shall mean the Corporate Identity Marketing and Operations Manual, Computer Manual, Sales Manual, or other manuals and training videos delivered by Franchisor to Franchisee pursuant to Paragraph 6(d) below as the same may be amended or supplemented by Franchisor from time to time.

"NDCS" shall mean National Database Computer System, a consolidated data base of all customer, debtor, and verification information used by Franchisee in the Franchise Business.

"Royalty Fee" shall mean the continuing percentage royalty fee due Franchisor pursuant to Paragraph 4(b) of this Agreement. Royalties are paid by Franchisee for the continued revenue generated by using the Checkcare system and brand name.

"Term of this Agreement" shall mean the Initial Term and the Renewal Term, if this Agreement is renewed.

"Trade Secrets" shall mean the whole or any part or phase of any information, procedure, design, technology, method or system which is used by and known only to Franchisor and disclosed to Franchisee and which gives Franchisee an advantage over competitors who do not know or use it including, without limitation, the Manual and the information contained therein.

    2.   Grant of Franchise. Except with respect to Key Accounts handled by Checkcare USA, Franchisor hereby grants to Franchisee subject to the terms and conditions set forth herein, the right and franchise to operate the Franchise Business only in the Franchise Area and only under the Proprietary Marks to be identified

utilizing the name "CHECKCARE" or such other name as Franchisor may hereafter designate in writing, and to use solely in connection therewith the System, as it may be changed, improved, and further developed from time to time.   So long as Franchisee is not in default hereunder, Franchisor will grant no other franchise for operation of a Franchise Business in the Franchise Area.   Franchisee shall operate the Franchise Business only within the Franchise Area unless Franchisee receives the prior written consent of Franchisor to operate outside the Franchise Area, which shall be in the exclusive discretion of Franchisor and which may not necessarily be based upon the closest existing Franchise Business. Franchisee will, however, immediately cease any such operations outside Franchisee's Franchise Area upon written notice from Franchisor to do so.   In such event, Franchisee will transfer its business outside the Franchise Area in such manner as shall be directed by Franchisor, and Franchisee shall have no further rights with respect thereto.   Franchisor will not operate a Franchisor owned unit of the Franchise Business within the Franchise Area so long as Franchisee is not in default hereunder.

In the event that a Franchisee violates the exclusive rights of another Franchisee's Franchise Area, the Franchise in violation shall remit all "Gross Revenues" collected in the other Franchisee's Franchise Area to that Franchisee and pay an additional sum of One Thousand and No/100 ($1,000.00) to that Franchisee. In the event Franchisor wrongfully assumes control over or moves a client account of Franchisee to Checkcare USA or another franchisee, Franchisor shall be liable to Franchisee for lost revenue resulting directly from such action by Franchisor.

3.   <u>Term and Renewal</u>.

(a) Unless sooner terminated as provided herein, this Agreement shall be for a term of seven (7) years from the date of execution of this Agreement (the "Initial Term").

(b)  Franchisee may, at Franchisee's option, renew this franchise for an unlimited number of additional terms of seven (7) years each (the "Renewal Terms"), provided that:

(i)   Franchisee has given Franchisor a written notice of such election to renew not less than six (6) months nor more than twelve (12) months prior to the end of the Initial Term or applicable Renewal Term;

(ii)  No later than sixty (60) days prior to the end of the Initial Term or applicable Renewal Term, Franchisee shall have executed Franchisor's then-current form of Franchise Renewal Agreement, which Franchise Renewal Agreement shall, at the expiration of the Initial Term or applicable Renewal Term,

supersede in all respects this Agreement and the terms of which Franchise Renewal Agreement will be substantially the same as the material terms of this Agreement exclusive of the fees to be paid pursuant to Subparagraphs 4(b)-(f) below, which may be changed as determined by Franchisor;

(iii)  At the end of the Initial Term or applicable Renewal Term, Franchisee shall not be in default under any provision of this Agreement, any amendment hereof or successor hereto, and shall have substantially complied with all of the terms and conditions of all such agreements during the term thereof;

(iv)  At the end of the Initial Term or applicable Renewal Term, Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor and its subsidiaries and affiliates and shall have timely met these obligations substantially throughout the term of this Agreement;

(v)  Simultaneously with the execution by Franchisee of the Franchise Renewal Agreement, but not later than sixty (60) days prior to the end of the Initial Term or applicable Renewal Term, Franchisee shall have executed a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its officers, directors, agents, employees and shareholders, except for matters previously brought to Franchisor's attention by written notice from Franchisee specifically identifying the claim and any corrective action necessary to cure the same; and

(vi)  Simultaneously with the execution by Franchisee of the Franchise Renewal Agreement, but not later than sixty (60) days prior to the end of the Initial Term or applicable Renewal Term, Franchisee shall have paid a renewal fee which shall be the lesser of 15% of the Initial Franchise Fee then being charged to new Franchisees for an area comparable to the Franchise Area or $25,000.  However, no renewal fee will be due on renewals subsequent to the first renewal if the average monthly royalty for the twenty-four (24) months prior to such renewal date is fifteen (15) times the Initial Monthly Royalty (as defined hereinafter) for the applicable Franchise Area.

(c)  Within thirty (30) days following the date of Franchisee's election to renew, Franchisor will give Franchisee written notice of Franchisee's satisfaction of the conditions for renewal set forth in subparagraphs 3(b)(iii) and (iv), which determination shall be exercised solely by Franchisor in good faith.

C0625-024
58841.5

4.    Fees.

(a)   Initial Franchise Fee.   Simultaneously with the execution of this Agreement Franchisee shall pay to Franchisor an Initial Franchise Fee in the amount of _____ _____ Dollars ($_____), which Franchisee acknowledges has been fully-earned upon execution of this Agreement, except as provided in Paragraph 11(a) below.  Upon the request of Franchisee, but solely at the option of Franchisor which may be withheld for any reason or for no reason, Franchisor will finance up to $22,500.00 (which will in no event exceed fifty percent (50%) of the Initial Franchise Fee) of the Initial Franchise Fee in accordance with the provisions of the Promissory Note (the "Note") attached hereto as Exhibit "B" and made a part hereof.  This option to finance the Initial Franchise Fee will not be applicable unless this Paragraph 4(a) is signed by Franchisor and Franchisee in the space indicated below.

Franchisor:                              Franchisee:

By_____              By_____

(b)   Royalty Fee.  Franchisee shall also pay to Franchisor a continuing monthly Royalty Fee (the "Royalty Fee") during the term of this Agreement in an amount equal to the greater of (i) five percent (5%) of Franchisee's Gross Revenues during said month, or (ii) one percent (1%) of the Initial Franchise Fee (but without reduction for multiple ownership of Franchises, if applicable) during the first two (2) years of the term of this Agreement, and two percent (2%) of the Initial Franchise Fee thereafter.  For the purposes of Paragraph 3(b)(6), the amount of the Royalty Fee determined to be payable for the first month of this Agreement shall constitute the "Initial Monthly Royalty".

(c)   Business Development Fee.  Franchisee shall pay to Checkcare USA a continuing monthly business development fee (the "Business Development Fee") in an amount to be determined by Franchisor but not to exceed one half of one percent (1/2%) of Franchisee's Gross Revenues during said month or one-fourth of one percent (1/4%) of the Initial Franchise Fee, whichever is greater. In addition, Franchisee shall pay to Checkcare USA or its designee a commission equal to its independent agent's commission on accounts originated through Checkcare USA.  Franchisor will cause Checkcare USA to provide Franchisee or any association of Franchisees with annual budgets and quarterly financial information of Checkcare USA for Franchisee or any such association to review.

(d)  <u>Key Account Administrative Fee</u>.  Franchisee shall also pay to Checkcare USA an administrative fee on Key Accounts in an amount to be determined by Franchisor but not to exceed two and one-half percent (2.5%) of Franchisee's Gross Revenues generated specifically from those accounts.  Any services performed above and beyond the scope of current services provided by Checkcare USA may be deemed "special services" and charged in addition to ordinary fees.

(e)  <u>NDCS Fee</u>.  Franchisee shall also pay or cause its Customers to pay to Checkcare USA a monthly fee of $.02 per transaction plus any cost incurred by Checkcare USA for each check verification during the prior month by customers in Franchise Area utilizing the National Database Computer System (NDCS).

(f)  <u>Client Reimbursement Fee</u>.  Pursuant to the Client Reimbursement Agreement, Franchisee shall pay to Checkcare Security Fund, Inc. a monthly fee in an amount to be determined by Franchisor, but not to exceed the lesser of (i) one hundred fifty dollars ($150.00) per month or (ii) ten thousand dollars ($10,000.00) per Franchise Area for Franchisees who originally contributed to Checkcare Security Fund, Inc. and/or signed the Franchise Agreement Addendum dated December 12, 1991, to be used for reimbursement of clients of Franchisees for losses that may be sustained through the operation of the Franchise Businesses (the "Client Reimbursement Fee").  Franchisor will cause the Client Reimbursement Fee to be deposited into a separate account to be administered by a committee of Franchisees.

(g)  <u>Computer Hardware and Software</u>.  Franchisee shall pay to Checkcare reasonable fees based on the current price list of Checkcare for any special customization of software or hardware requested by Franchisee.

(h)  <u>Late Payment and Penalty Fees</u>.  Franchisee shall pay to Checkcare all fees when due.  Overdue amounts will incur a "Late Payment" charge of one hundred dollars ($100.00), plus interest on the overdue amount, at an annual rate of four percentage (4%) points above the prime rate of interest as published in the Wall Street Journal.  Franchisee shall also pay to Franchisor reasonable charges, as determined by Franchisor, arising from the late transmission of data to Franchisor, computer system manipulation, Franchisee checking account overdraft, or technical support provided to Franchisee outside the scope of this Agreement.

(i)  <u>Timing and Nature of Payments</u>.  The fees set forth in Paragraphs 4(b), (c), (d), (e), (f), and (g) above will not accrue until the date the Franchisee commences operation of the

Franchise business. All fees accrued in a given calendar month are due on or before the tenth (10th) day of the following calendar month. Franchisor may collect all fees due by EFT or such other means as determined by Franchisor.

5.   <u>Financial Information</u>.

(a) During the term of this Agreement (and for such period thereafter as required to satisfy Franchisee's obligations set forth in this Paragraph below), Franchisee shall:

(i) Maintain, keep current, and reconcile monthly the checkbook required in connection with the operation of the System. Franchisee will also utilize standardized accounting codes, as determined by Franchisor, and electronically transmit on a daily basis financial and such other information as Franchisor may reasonably require.

(ii) Maintain and preserve for at least four (4) years from the dates of their preparation, full, complete and accurate books, records and accounts in accordance with generally accepted accounting principles;

(iii) Submit to Franchisor, no later than ten (10) days after the close of each quarter during the term of this Agreement, a quarterly statement on forms prescribed by Franchisor, accurately reporting Franchisee's Gross Revenues during the preceding quarter and such other data or information regarding the operation of the Franchise Business as Franchisor may reasonably require;

(iv) Submit to Franchisor, no later than twenty-five (25) days after the close of each quarter during the term of this Agreement, a profit and loss statement and balance sheet prepared in accordance with generally accepted accounting principles, consistently applied, and in a form satisfactory to Franchisor, showing the results of Franchisee's operation of the Franchise Business during the preceding quarter.

(v) Submit to Franchisor, no later than the ninetieth (90th) day following the close of each of Franchisee's fiscal years during the term of this Agreement, a profit and loss statement and balance sheet prepared in accordance with generally accepted accounting principles, consistently applied, and in form satisfactory to Franchisor, showing the results of Franchisee's operation of the Franchise Business during said fiscal year. Each such statement shall be signed by Franchisee or by Franchisee's treasurer or chief financial officer attesting that the financial



# CHECKCARE
### ENTERPRISES · INC


## Checkcare Software Hold Harmless Agreement

Franchisee acknowledges that any, and all, Checkcare software provided by the Franchiser, Checkcare Enterprises, is to be utilized in strict conformance with all Federal, State and local laws, rules and regulations. In addition, Franchisee will adhere to the Rules and Regulations established by the National Automated Clearing House Association (NACHA) which governs the ACH network.

In consideration for Checkcare's continued license of the software to the Franchisee, Franchisee agrees to indemnify and hold harmless Checkcare Enterprises from and against all claims, actions, loss, damages, costs, and expenses, including attorney fees arising from any claims, demands, actions or suits of any nature whatsoever arising as a result of negligent or improper use of the Checkcare software by Franchisee.

In WITNESS WHEREOF, the parties have executed this Agreement as of the date first written below:

Checkcare Enterprises                         Franchise Location  Memphis

By: _____                By: _____

_____                _____
Bill Brandon                                  Susan E. Perlmutter
Print Name                                    Print Name


Date: 5/17/01                                 Date: 5-17-01

061198

statements present fairly the financial position of Franchisee and the results of operation of Franchisee's Franchise Business during the period covered.   All annual financial statements shall be obtained at Franchisee's expense and shall be prepared by an independent certified public accountant.

(b)  Audit.   Franchisor or its designated agents shall have the right at all reasonable times to examine the books, records and tax returns of Franchisee.   Franchisor shall also have the right, at any time, to have an audit made of the books of Franchisee in addition to any other examination or audit rights granted to Franchisor by this Agreement.   If any audit or examination should reveal that payments due Franchisor under this Agreement have been understated in any report to Franchisor, then Franchisee shall immediately pay to Franchisor on demand the amount understated, in addition to interest from the date such amount was due until paid as provided in Paragraph 4(h) of this Agreement.   The amount of any overpayment by Franchisee to Franchisor shall be promptly repaid by Franchisor to Franchisee upon demand therefor.   If any audit or examination discloses an understatement in any report of two percent (2%) or more, Franchisee shall, in addition, reimburse Franchisor for any and all reasonable costs and expenses connected with the examination or audit (including, without limitation, reasonable accounting and attorneys' fees).   The foregoing remedies shall be in addition to any other remedies Franchisor may have.

6.   Duties of Franchisor.

(a)  Franchisor shall provide an initial training program in Columbus, Georgia for Franchisee and Franchisee's employees with respect to the operation of the System and the day-to-day operation of the Franchise Business.

(b)  Franchisor may, at Franchisee's request,   make recommendations regarding site selection, plans and general specifications for the location of the Franchise Business.

(c)  At Franchisor's direction based upon its determination of Franchisee's need therefor, Franchisor shall provide on-site assistance and supervision as needed, as Franchisor may deem necessary.

(d)  Franchisor shall furnish Franchisee with a copy of the Manual containing copies of the forms of agreements with customers, collection notices, letters and material presently utilized by Franchisor and its Franchisees in the conduct of the Franchise Business, all items which are so designated are to be considered trade secrets or Confidential Information, a list of

C0625-024
58841.5                              9

061198

national and/or regional accounts with which Franchisor has heretofore established contact, a description of its computer software program application, and upon the written request of Franchisee a copy of its service mark "CHECKCARE", and a copy of its Federal registration.

(e) Franchisor shall during the term of this Agreement, from time to time, furnish Franchisee with copies of any suggested changes in, or improvements to the Manual and/or its methods of operation of the Franchise Business.

7.  <u>Duties of Franchisee</u>.

(a) Franchisee understands and acknowledges that every detail of the Franchise Business, including future developments in technology, is important to Franchisee, Franchisor, and other Franchisees.  Franchisor reserves the right to change hardware and software requirements in order to develop and maintain high and uniform operating standards to increase the demand for the services provided by the Franchise Business, and to protect Franchisor's Proprietary Marks, reputation and goodwill.

(b) Within forty-five (45) days after the execution of this Agreement, Franchisee shall select a site, subject to the approval of Franchisor, for the Franchise Business.  Prior to the acquisition by lease or purchase of any site for the Franchise Business, Franchisee shall submit a description of the proposed site to Franchisor.  Franchisor shall provide Franchisee written notice of approval or disapproval of the proposed site within ten (10) days after receipt of Franchisee's written proposal.

(c) Franchisee, if an individual, or any owner of the shares, general partnership interests or member interests, as the case may be, of Franchisee, if Franchisee is a corporation, partnership or limited liability company, shall participate in the management and overall operation of the Franchise Business or shall cause a manager, who has successfully completed Franchisor's training program, to manage the overall operation of the Franchise Business, and shall operate or shall cause the Franchise Business to be operated in strict conformity with all federal, state, and local laws, ordinances, rules and regulations and (to the extent not inconsistent with such applicable laws, ordinances, rules and regulations) such standards, techniques and procedures as Franchisor may from time to time reasonably prescribe in the Manual or otherwise in writing, and shall refrain from deviating therefrom without Franchisor's prior written consent.

061198

(d)   Franchisee shall offer only such products and services as shall have been approved for the Franchise Business by Franchisor in writing and not thereafter disapproved. Franchisee shall discontinue offering any products or services or the method of offering the same if Franchisor, in its discretion, gives notice of disapproval in writing at any time.

(e)   Franchisee shall permit Franchisor or its agents, at any reasonable time, to inspect Franchisee's place of business and to review all books, records, bank statements, operational data of every kind, materials and methods of operation utilized by Franchisee in connection with the operation of the Franchise Business. Franchisee shall pay all reasonable expenses incurred by Franchisor and its employees in connection with such inspections, except that an audit or examination of Franchisee's books and records shall be at Franchisor's expense as provided in Paragraph 5(b) above.

(f)   Franchisee shall at all times in connection with the operation of the Franchise Business maintain its office accessible to the public and its customers during normal business hours, including the operation an incoming 800 telephone number. Franchisee shall also maintain the premises in a clean, attractive condition and in good repair.  Franchisee shall not use or permit the use of the premises for any other purpose or activity other than the Franchise Business without the prior written consent of Franchisor.

(g)   The Franchisee Business shall at all times employ at Franchisee's sole cost and expense not less than two (2) full-time employees, one of whom may be Franchisee; provided, however, in the sole discretion of Franchisor, Franchisor may determine that fewer employees are needed.

(h)   If Franchisee is an individual and does not personally participate in the direct operation of the Franchise Business or if Franchisee is a corporation or partnership whose principal owners do not participate in the direct operation of the Franchise Business, then Franchisee shall appoint a manager who must participate in the direct operation of the Franchise Business and notify Franchisor in writing of the manager's name and address.

(i)   Franchisee shall display the Proprietary Marks and Franchisee's business address and phone number on all promotional, sales and advertising materials, including, without limitation, all printed advertising or every kind and nature, business stationery and cards, and signs, decals and stickers for customers.  Franchisee shall obtain Franchisor's prior approval for all said promotional, sales, and advertising plans and materials.

061198

(j)   Franchisee shall operate the Franchise Business in conformity with such uniform methods, standards, and specifications as Franchisor may from time to time prescribe in the Manual, the "Checkcare Standards" book provided by Franchisor, or otherwise in writing to insure that the highest degree of quality and service is uniformly maintained.   Franchisee agrees to use in the Franchise Business such standard contracts, forms, reports, and methods of operation as may be prescribed by Franchisor in the Manual, the "Checkcare Standards" book provided by Franchisor, or otherwise approved by Franchisor in writing.   Any materials used by Franchisee in connection with the Franchise Business and which are disseminated to the general public and not provided by Franchisor must be approved in writing by Franchisor, and if the same are disapproved by Franchisor, the use of the source shall be immediately discontinued by Franchisee at the request of Franchisor.

(k)   Franchisee shall cause the Franchise Business to be actively operated under this Agreement for the full term of this Agreement and any renewal thereof.

(l)   Franchisee agrees that it is important to the operation of the Franchise Business that Franchisee and Franchisee's employees receive initial and on-going training as Franchisor may require and to that end Franchisee agrees as follows:

(i)   Franchisee and/or Franchisee's employees shall attend and complete to Franchisor's satisfaction the initial training program conducted at Franchisor's headquarters in Columbus, Georgia, or such other location as Franchisor may designate, at such times as Franchisor may prescribe.   The initial training program for Franchisee or Franchisee's Manager shall familiarize the trainee with all aspects of the operation and management of the Franchise Business.   Franchisor shall provide and pay only for the training instructors, facilities, and training materials in connection with Franchisor's initial training program.

(ii)   Franchisee shall pay registration fees and all expenses incurred by Franchisee and its employees in connection with all on-going training programs or seminars, including, without limitation, the cost of travel, room, board, and wages.   In addition, with respect to any additional instruction requested by Franchisee or deemed reasonably necessary by Franchisor, Franchisee shall pay all reasonable personal expenses of Franchisor's representative plus a reasonable per diem charge for each such representative, as determined by Franchisor.

(m)   Franchisee shall comply with all federal, state, and local laws, rules, and regulations, including, without limitation the Fair Debt Collection Practices Act ("FDCPA") and state return check charge laws, and shall timely obtain, and shall keep in force

061198

as required throughout the term of this Agreement, any and all permits, leases, certificates, or licenses necessary for the full and proper conduct of the Franchise Business, including, without limitation, any building and other required construction permits, licenses to do business, fictitious name registrations, sales tax permits, health and sanitation permits and ratings, and fire clearances.

(n)   Franchisee shall notify Franchisor in writing within five (5) days after Franchisee receives notice of the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation or financial condition of the Franchise Business.

(o)   The computer software for the check recovery system to operate the Franchise Business is included in the Initial Franchise Fee. Franchisor is responsible for all costs incurred in the selection and customization of this software to Franchisee. Franchisee shall purchase all computer operating systems hardware and other software from sources reasonably approved by Franchisor. Franchisee understands that some sources may be affiliated with Franchisor. Franchisee will obtain and maintain in operation all equipment and software necessary for the operation of the Franchise Business as prescribed from time to time by Franchisor, such as modems, direct data lines and other business methods for data transfer or computer hardware and software upgrades that are required to operate the Checkcare computer software. Franchisee shall acquire and maintain dedicated communication lines and devices, as specified by Franchisor, providing full and unlimited access to all computer operating systems and software used in the operation of the Franchise's Business. Franchisor will provide on-going support for the Unix System V Operating System and all standard proprietary software required by Franchisor. Franchisor will not install or provide maintenance support for computer hardware for Franchisee.

(p)   Franchisee shall electronically deliver on a daily basis to Franchisor such debtor account data base records and any or all other data for use by Franchisor in conjunction with such records of other Franchisees as Franchisor may desire. Franchisor shall have the right to merge and co-mingle all such data and records and to use the same in such manner and for such purposes as Franchisor may desire, including but not limited to Key Account reimbursement and reporting, the NDCS, and internal management reports.

(q)   Franchisee shall become a member of the American Collectors Association and a member of the Check Services Subsidiary Organization as soon as Franchisee is eligible or such other

061198

trade associations as Franchisor may uniformly require of all Franchisees for such membership.

(r)   Franchisee shall attempt collections as may be prescribed by Franchisor in the Manual, the "Checkcare Standards" book provided by Franchisor, or otherwise approved by Franchisor in writing.  The outsourcing of collections to any other businesses, including attorneys, must be reasonably approved by Franchisor in writing.  Franchisor reserves the right to disapprove or discontinue approval of an outsourced collections relationship.

(s)   Franchisee must obtain the written approval of Franchisor before Franchisee executes any contracts for any third party check truncation or "RCK" services.  Franchisor may withhold approval of such services at its sole discretion.

8.   <u>Proprietary Marks</u>.

(a)   Franchisor represents with respect to the Proprietary Marks that:

(i)   Franchisor is the owner of all right, title, and interest in and to the Proprietary Marks.

(ii)   Franchisor has taken and will take all steps reasonably necessary to preserve and protect the ownership and validity of the Proprietary Marks.

(iii)   Franchisor will use and permit Franchisee and other franchisees to use the Proprietary Marks only in accordance with the System and the standards and specifications attendant thereto which underlie the goodwill associated with and symbolized by the Proprietary Marks.

(b)   With respect to Franchisee's use of the Proprietary Marks pursuant to this Agreement, Franchisee agrees that:

(i)   Franchisee shall use only the Proprietary Marks designated by Franchisor and shall use them only in the manner authorized and permitted by Franchisor.

(ii)   Franchisee shall use the Proprietary Marks only for the operation of the Franchise Business in the Franchise Area.

(iii)   Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

061198

(iv)  Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor.

(v)  Franchisee shall not use the Proprietary Marks as part of its corporate or other legal name without Franchisor's prior written consent.

(vi)  Franchisee shall comply with Franchisor's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

(vii)  In the event that litigation involving the Proprietary Marks is instituted or threatened against Franchisee, Franchisee shall promptly notify Franchisor.  Franchisor, at Franchisor's cost and expense, shall undertake such legal action as Franchisor shall deem appropriate in the defense or prosecution of any litigation relating to the Proprietary Marks.  Franchisee agrees to execute any and all documents, and to render such assistance (exclusive of monetary assistance) as may, in the opinion of Franchisor's counsel, be reasonably requested to carry out such defense or prosecution.

(c)  Franchisee expressly understands and acknowledges that:

(i)  Franchisor is the owner of all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them.

(ii)  The Proprietary Marks are valid and serve to identify the System and those who are franchised under the System.

(iii)  Franchisee shall not directly or indirectly contest the validity or the ownership of the Proprietary Marks.

(iv)  Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership interest or other interest in or to the Proprietary Marks, except the non-exclusive license granted herein.

(v)  Any and all goodwill arising from Franchisee's use of the Proprietary Marks in the Franchise Business shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks.

(vi)  The right and license of the Proprietary Marks granted hereunder to Franchisee is non-exclusive, and Franchisor thus may:

(A)  use, and grant licenses to others to use, the Proprietary Marks, including use in connection with the sale of products, and

(B)  establish, develop, and license other systems, different from the System licensed herein, without offering or providing Franchisee any rights in, to, or under such other systems.

(d)  Franchisee agrees to operate in the name of, and to emphasize in the operation of the Franchise Business and in all advertising matters, subject to Franchisor's approval, the Proprietary Marks and such other characteristics of the System as Franchisor may require in the Manual or otherwise in writing.

9.  <u>Corporate Identity Marketing and Operations Manual</u>.

(a)  In order to protect the reputation and goodwill of Franchisor and to maintain uniform operating standards under the Proprietary Marks and the System, Franchisee shall conduct the operation of the Franchise Business in accordance with the Manual, one copy of which Franchisee shall receive within ten (10) days after the execution of this Agreement, on loan from Franchisor for the term of this Agreement.

(b)  Franchisee shall at all times treat the Manual, any other manuals created for or approved for use in the operation of the Franchise Business, and the information contained therein as confidential, and shall use all reasonable efforts to maintain such information as secret and confidential.  Franchisee shall not at any time, without Franchisor's prior written consent, copy, duplicate, record, or otherwise reproduce the foregoing materials, in whole or in part, nor otherwise make the same available to any unauthorized person.

(c)  The Manual shall at all times remain the sole property of Franchisor.

(d)  Franchisor may from time to time revise the contents of the Manual, and Franchisee expressly agrees to comply with each new or changed standard, provided that the same does not diminish the rights granted to Franchisee under this Franchise Agreement.

(e)  Franchisee shall at all times insure that its copy of the Manual is kept current and up-to-date, and in the event of any dispute as to the contents of the Manual, the terms of the

master copy of the Manual maintained by Franchisor at Franchisor's headquarters shall be controlling.

(f)   Franchisor makes no representation that the Manual and the operation of the System pursuant thereto complies with the applicable laws of each state in which a Franchise Business may be located, and it is therefor the responsibility of Franchisee, at Franchisee's sole cost and expense, to make such investigation and review of applicable laws as Franchisee may deem appropriate. Franchisee shall notify Franchisor in writing of any non-compliance with laws, rules and/or regulations discovered by Franchisee in connection with said investigation, and thereafter operate the Franchise Business in a manner that fully complies therewith.

10.   Confidential Information.

(a)   Franchisee shall not, during the term of this Agreement, any renewal thereof, or for a period of two (2) years after the expiration or termination of same, communicate, divulge, or use for the benefit of any other person, persons, partnership, association, or corporation any Confidential Information which may be communicated to Franchisee, or of which Franchisee may be apprised, by virtue of Franchisee's operation under the terms of this Agreement. Franchisee shall divulge such Confidential Information only to such of its employees as must have access to it in order to operate the Franchise Business.   Any and all informa- tion, knowledge, and know-how, including, without limitation, forms, letters, contracts, techniques, computer software programs and other data, which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at the time of disclosure by Franchisor to Franchisee, had become a part of the public domain, through publication or communication by others; or which, after disclosure to Franchisee by Franchisor, becomes a part of the public domain, through publication or communication by others.

(b)   Franchisee shall require all employees performing managerial functions (and all other individuals who have access to Confidential Information) to execute agreements, in a form satisfactory to Franchisor, to maintain the confidentiality during the course of employment and thereafter of all information designated by Franchisor as confidential.   Copies of the executed agreements shall be submitted to Franchisor upon request.

(c)   Franchisor shall have the non-exclusive right to use and to incorporate in the System and Manual, for the benefit of Franchisor and other franchisees of Franchisor, any modifications, changes, and improvements, in whole or in part, developed or discovered by Franchisee or Franchisee's employees or agents in

061198

connection with the Franchise Business, without any liability or obligation to the developer thereof.

11.   <u>Transferability of Interest</u>.

(a)   <u>Transfer by Franchisee</u>:   (i) Franchisee shall not sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber or hypothecate any interest in this Agreement, or the Franchise Business without the prior written consent of the Franchisor.   If Franchisee is a corporation or partnership, Franchisee hereby represents and warrants to Franchisor that the statement of its legal composition attached hereto is true and complete as of the date hereof. Except as otherwise permitted in this Paragraph 11, Franchisee shall not cause any change to be made in its legal composition, admit any additional partner or partners, or issue any shares of its stock, nor cause or permit any shares of its stock to be sold, transferred, pledged or assigned, after the date of this Agreement, without the prior written consent of Franchisor. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may then terminate without opportunity to cure pursuant to this Agreement.

(ii) Franchisor shall not unreasonably withhold its consent to a transfer of any interest in Franchisee or in this Agreement, subject to the conditions set forth below.  Franchisee and, in the event of Franchisee's bankruptcy, Franchisee's trustee in bankruptcy, acknowledges and agrees that each condition which must be met by the transferee franchisee is necessary for such transferee's full performance of the obligations hereunder.  The conditions which must be met prior to the time of transfer are as follows:

(A)   All of Franchisee's accrued monetary obligations to Franchisor hereunder and all other outstanding obligations related to the Franchise Business shall have been satisfied;

(B) The transferor's right to receive compensation, pursuant to any agreement or agreements for the purchase of any interest in Franchisee or this Agreement, shall be subordinate and secondary to Franchisor's right to receive payment of any outstanding monetary obligations or other outstanding obligations due from the transferor or Franchisee pursuant to this Agreement, and whether arising before or after said transfer;

(C) The transferor shall have executed a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its officers, directors, shareholders and employees, in their corporate and

individual capacities, including, without limitation, claims arising under federal, state, and local laws, rules, and ordinances;

(D) The transferee shall enter into a written assignment, under seal and in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's outstanding obligations under this Agreement as of the date of the transfer;

(E) The transferee shall demonstrate to Franchisor's satisfaction that it meets Franchisor's educational, managerial, and business standards; possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to conduct the Franchise Business (as may be evidenced by prior related business experience or otherwise); and has adequate financial resources and capital to operate the Franchise Business;

(F) The transferee shall execute (and/or, upon Franchisor's request, cause all interested parties to execute) the then-current standard form franchise agreement and other ancillary agreements as Franchisor may require for the Franchise Business for a term ending on the date of expiration of the Initial Term or applicable Renewal Term of this Agreement (and with such additional Renewal Terms as shall then exist under this Agreement);

(G) At transferee's expense and upon such other terms and conditions as Franchisor may reasonably require, transferee or a major principal of a corporate or partnership transferee, and transferee's employees shall complete any training programs then required by Franchisor. "Major principal" as used herein shall mean those persons having the power to control a corporate or partnership transferee or otherwise holding a ten percent (10%) or greater interest in a corporate or partnership transferee; and

(H) Except in the case of a transfer to a corporation formed solely for the convenience of ownership, a transfer fee, which shall be no more than the lesser of (1) twenty-five percent (25%) of the then-current Initial Franchise Fee for new franchise in a Franchise Area of comparable size, or (2) $25,000, shall have been paid to reimburse Franchisor for administrative and other expenses in connection with the transfer.

(I) Any transfer will be effective at 12:01 a.m. on either the eighth or the twenty-third day of each month, as requested by Franchisee and approved by Franchisor. This limitation is to ensure that claims, which are to be paid on the first and fifteenth of each month, are paid by Franchisee as a condition to the transfer.

061198

(J)   The transferee shall subordinate any obligations that the Franchisee may then or thereafter owe to its owners to obligations which the Franchisee may incur to Franchisor pursuant to this Agreement.

(b)   Transfer to Franchisee's Corporation:  In the event the proposed transfer is to a corporation formed solely for the convenience of ownership, Franchisor's consent to such transfer may, in addition to the requirements of 11(a)(ii) hereof and in its sole discretion, be conditioned on the following requirements:

(i)   The corporate franchisee shall be newly organized and its charter shall provide that its activities are confined exclusively to operating the Franchise Business;

(ii)   Franchisee shall not diminish his proportionate ownership interest in the transferee franchisee, except as may be required by law, and shall act as its principal executive officer;

(iii)   Each stock certificate of the corporate franchisee shall have conspicuously endorsed upon its face a statement in a form satisfactory to Franchisor that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon assignments by this Agreement; and

(iv)   Copies of transferee's Articles of Incorporation, Bylaws, and other governing documents, including the resolutions of the Board of Directors authorizing entry into this Agreement, shall be promptly furnished to Franchisor.

(c)   Transfer of an Interest in a Corporate or Partnership Franchisee:

(i)   The restrictions imposed by Paragraph 11(a) above shall not be applicable to the sale, assignment, transfer, pledge or hypothecation of less than majority control of Franchisee, if a partnership, or if Franchisee is a corporation, less than majority control of Franchisee's stock therein.

(ii)   If Franchisee is a corporation, it shall maintain stop transfer instructions against the transfer on its records of any securities with voting rights subject to the restrictions of Paragraph 11 hereof, and shall issue no such securities upon the face of which the following printed legend does not legibly and conspicuously appear:

"The transfer of the shares represented by this certificate is subject to the terms and conditions of that certain Checkcare Systems Franchise Agreement dated _____.  A copy of

said Franchise Agreement is on file with the Secretary of the Corporation. By acceptance of this certificate, the holder hereof agrees to be bound by the terms of said Franchise Agreement."

(iii) Franchisee may become a "Public Entity" and engage in initial or secondary offerings of its securities only with prior written consent of Franchisor. No Franchisee public offering shall imply (by the use of the Proprietary Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or public offering of Franchisee or Franchisor securities, and Franchisor's review of any offering shall be limited solely to the subject of the relationship between Franchisee and Franchisor. For each proposed public offering, Franchisee shall reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering, including, without limitation, legal and accounting fees. A "Public Entity" shall be defined as a Franchisee required to register under the Securities Exchange Act of 1934 or similar statute. Franchisee shall give Franchisor written notice as least sixty (60) days prior to the effective date of any public offering, or other transaction covered by this Paragraph 11(c).

(iv) The principals of a corporate or partnership Franchisee may agree among themselves as to the purchase of a principal's interest in the Franchisee corporation or partnership following such principal's death, disability or mental incompetency. A transfer of an interest in this Agreement pursuant to such an agreement shall not be subject to the terms and conditions of this Paragraph 10; provided, however, that a greater than fifty percent (50%) interest in a corporate or partnership Franchisee owned by a deceased or incompetent principal of Franchisee shall not be transferred to a party not owning an interest in Franchisee immediately prior to the death or declaration of mental incompetency of such principal unless the proposed transferee meets the conditions imposed on transfers by Paragraph 11(a) above.

(d)   Franchisor's Right of First Refusal:

(i) Any party holding a twenty-five percent (25%) or greater interest in the Franchisee or this Agreement and who desires to accept any bona fide offer to purchase his or its interest in the Franchise Business from a third party, shall notify Franchisor in writing or each such offer, and Franchisor shall have the right and option, exercisable within fourteen (14) days after receipt of such written notification, to send written notice to the seller that Franchisor or its nominee intends to purchase seller's interest on the same terms and conditions offered by the third party. However, transfers between individual Franchisees, initial shareholders if Franchisee is a corporation, initial partners if Franchisee is a partnership, such persons and their sons, daugh-

ters, spouses, or parents, parents-in-law, brothers-in-law or sisters-in-law and transfers permitted pursuant to Paragraph 11(c)(i) above shall not be subject to Franchisor's right of first refusal described in this Paragraph 11(d). Any change in the terms of any offer prior to closing shall constitute a new offer subject to the same rights or first refusal by Franchisor or its nominee as in the case of an initial offer. In the event that Franchisor or its nominee elects to purchase seller's interest, closing on such purchase must occur within seventy-five (75) days from the date of notice to seller of the election to purchase by Franchisor or its nominee. The sale by Franchisee must be consummated within seventy-five (75) days after the expiration of the fourteen-day period set forth above, or the transfer will again become subject to Franchisor's right of first refusal as provided above. Failure of Franchisor to exercise the option afforded by this Paragraph 11(d) shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Paragraph 11, with respect to a proposed transfer.

(ii) In the event the consideration, terms, and/or conditions offered by third party are such that Franchisor or its nominee may not reasonably be required to furnish the same consideration, terms, and/or conditions (provided, however, cash and a promissory note are terms that Franchisor would be required to furnish), then Franchisor or its nominee, as appropriate, may purchase the interest in the Franchise Business proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree, within a reasonable time, on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by a third party, an independent appraiser acceptable to Franchisee shall be designated by Franchisor, and his determination shall be binding.

(e)   Transfer Upon Death, Disability or Mental Incompetency:

(i) Upon the death, disability or mental incompetency of an individual Franchisee or any person with a direct ownership interest in this Agreement, or with a twenty-five percent (25%) or greater interest as a shareholder or general partner in any corporate or partnership Franchisee, the executor, administrator, personal representative, guardian, or trustee of such person shall transfer said interest to a third party approved by Franchisor within six (6) months of such death, disability or mental incompetency. Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to the same conditions as an inter vivos transfer. However, in the case of transfer by devise or inheritance, if the heirs or beneficiaries of any such person are unable to meet the conditions in this Paragraph 11, the personal representative of the deceased Franchisee shall have a reasonable time, not to exceed nine (9) months from the date

of death, to dispose of the deceased's interest in the Franchise, which disposition shall be subject to all the terms and conditions for transfers contained in the Agreement.

(ii)  Immediately following the death, disability or determination of mental incompetency of an individual Franchisee or any person with a direct interest in this Agreement, and during any period in which the Franchise Business is operated by any executor, administrator, personal representative, guardian, or trustee of such person, the day-to-day operation of the Franchise Business shall be conducted under the supervision of an individual satisfactory to Franchisor.  In such circumstances, Franchisor may, in its sole discretion, but without any liability to Franchisor for any acts of said Manager, provide a Manager for the Franchise Business, for which Franchisor shall be reimbursed by Franchisee, within ten (10) days of the end of any calendar month, for all compensation and maintenance costs incurred by Franchisor in providing such Manager.

(f)  <u>Non-Waiver of Claims</u>:  Franchisor's consent to a transfer of any interest in this Agreement or the Franchise granted herein shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

(g)  <u>Transfer by Franchisor</u>:  Franchisor shall have the right to transfer or assign all or any part of its rights or obligations herein to any person or legal entity.

12.  <u>Default and Termination</u>.

(a)  Franchisee may terminate this Agreement, and all rights granted hereunder shall terminate, at any time prior to the expiration of ten (10) days from the date of execution of this Agreement, effective immediately upon receipt of written notice from Franchisee.  In that event, Franchisor shall refund the Initial Franchise Fee.

(b)  If Franchisee is in compliance with this Agreement and Franchisor breaches its obligations under this Agreement and fails to cure said breach within thirty (30) days after written notice of such breach is delivered to Franchisor, Franchisee may terminate this Agreement and the Franchise, effective ten (10) days after delivery to Franchisor of notice of such termination. Termination of this Agreement and the Franchise by Franchisee without complying with the foregoing requirements or for any other reason other than breach of this Agreement by Franchisor and the failure of Franchisor to cure such breach within thirty (30) days after receipt of written notice of such breach shall be deemed a default by Franchisee hereunder.

061198

(c)  Franchisee shall be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or make a general assignment for the benefit of creditors, or if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and consented to by Franchisee, or if Franchisee is adjudicated a bankrupt, or if a proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee, or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction, or if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee, or if a final judgment remains unsatisfied or of record for sixty (60) days or longer (unless supersedeas bond is filed), or if execution is levied against the Franchise Business or property, or suit to foreclose any lien or mortgage against Franchisee's premises is instituted against Franchisee and not stayed, bonded, discharged or dismissed within sixty (60) days, or if the real or personal property of the Franchise Business shall be sold after levy thereupon by any sheriff, marshall, or constable.

(d)  Franchisee shall be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective upon the receipt of written notice by Franchisee from Franchisor given as provided in Paragraph 19 below, upon the occurrence of any of the following events:

(i)  If Franchisee ceases to operate or otherwise abandons the Franchise Business, or if Franchisee fails to make timely payments to its customers in accordance with the terms of the agreements between Franchisee and its customers or any master agreement between Franchisor and customers served by Franchisee.

(ii)  If Franchisee is convicted of a crime involving moral turpitude, or commits any other crime or offense, or engages in any unethical business conduct which, in the sole opinion of Franchisor, is reasonably likely to adversely affect the System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's interest therein.

(iii)  If Franchisee purports to transfer any rights or obligations under this Agreement to any third party without Franchisor's prior written consent, contrary to the terms of Paragraph 10 of this Agreement.

(iv)  If Franchisee fails to comply with the covenants in Paragraph 13 hereof.

(v)   If Franchisee discloses or divulges the contents of the Manual or other trade secret or Confidential Information provided Franchisee by Franchisor contrary to Paragraphs 8 and 9 hereof.

(vi)   If an approved transfer is not effected within the time following Franchisee's death or mental incompetency required by Paragraph 11(e) hereof.

(vii)   If Franchisee is in default, as defined in Section 12 below, whether or not such defaults have been cured, on two (2) occasions in any twelve (12) month period.

(viii)   If Franchisee made or makes any material misrepresentation to Franchisor in any information or report provided prior to or during the term of this Agreement.

(ix)   If Franchisee defaults in Franchisee's payment under the Note, if executed as provided in Paragraph 4(a) above.

(e)   Except as otherwise provided in Paragraphs 12(a), (c) and (d) above, Franchisee shall have thirty (30) days after its receipt from Franchisor of a written Notice of Termination within which to remedy any default hereunder and provide evidence thereof to Franchisor.  If any such default is not cured within that time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee effective immediately upon the expiration of the thirty (30) day period, or such longer period as applicable law may require.  Franchisee shall be in default hereunder for any failure substantially to comply with any of the requirements imposed by this Agreement, as it may from time to time reasonably be supplemented by the Manual, or to carry out the terms of this Agreement in good faith.  Such defaults shall include, for example, without limitation, the occurrence of any of the following events:

(i)   If Franchisee fails, refuses, or neglects promptly to pay any monies owing to Franchisor or its subsidiaries or affiliates when due or to submit reports and other information required by Franchisor pursuant to this Agreement.

(ii)   If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein.

(iii)   If Franchisee fails, refuses, or neglects to obtain Franchisor's prior written approval or consent as required by this Agreement.

061198

13.  <u>Obligations Upon Termination</u>.   Upon termination or expiration, this Agreement and all rights granted hereunder to Franchisee shall forthwith terminate and:

(a)  Franchisee shall immediately cease to operate the Franchise Business, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

(b)  Franchisee shall immediately and permanently cease to use, by advertising or in any manner whatsoever, the System, all Confidential Information and any Proprietary Marks and distinctive forms, slogans, signs, symbols, logos, or devices associated with the Franchise Business.  In particular, Franchisee shall cease to use, without limitation, all signs, advertising materials, stationery, forms, and any other articles which display the Proprietary Marks associated with the Franchise Business.

(c)  Franchisee shall take such action as may be necessary to change its corporate name if it in any manner utilizes the name "Checkcare" or the Proprietary Marks, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

(d)  Franchisee agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy of colorable imitation of the Proprietary Marks either in connection with such other business or the promotion thereof, and further agrees not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with Franchisor so as to constitute unfair competition.  Franchisee shall make such modifications or alterations to the premises operated hereunder (including, without limitation, the changing of the telephone number) immediately upon termination or expiration of this Agreement as may be necessary to prevent any association between Franchisor or the Franchise Business and any business thereon subsequently operated by Franchisee or others, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.  In the event Franchisee fails or refuses to comply with the requirements of this Paragraph 13, Franchisor shall have the right to enter upon the premises where the Franchise Business was conducted, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

(e)  Franchisee shall promptly pay all sums owing to Franchisor and all charges and penalties arising under paragraph 2 to such other Franchisee.  In the event of termination for any

CC625-024
58841.5

061198

default of Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default.

(f)   Franchisee   shall   pay   to   Franchisor   all   damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor subsequent to the termination or expiration of the franchise herein granted in obtaining injunctive or other relief for the enforcement of any provisions of this Paragraph 12, or Paragraph 13 below.

(g)   Franchisee shall immediately turn over to Franchisor all manuals, including the Manual, customer lists, all computer software programs and data, records, files, uncollected checks (for which   payment   has   not   been   made),   instructions,   brochures, agreements, disclosure statements, and any and all other materials provided by Franchisor to Franchisee relating to the operation of the   Franchise   Business   (all   of   which   are   acknowledged   to   be Franchisor's property).

(h)   Franchisor   shall   have   the   right,   at   its   sole election and without notice to Franchisee, to contact customers of Franchisee for the purpose of verifying the status of the accounts and checks of said customers.   Franchisor shall furthermore have the   right   to   conduct   the   Franchise   Business   for   the   purpose   of fulfilling Franchisee's obligations to Franchisor and Franchisee's customers, but Franchisor shall have no obligation or liability to Franchisee other than to pay any net income from the operation of the Franchise Business, after payment of all costs of operation and the expenses incurred by Franchisor, to the payment of Franchisor for its fees due hereunder and to customers of Franchisee.

(i)   Franchisor shall have the right (but not the duty), to be exercised by notice within thirty (30) days after termination or expiration, to purchase for cash any or all equipment, supplies, and other inventory, signs, advertising materials, and all items bearing Franchisor's Proprietary Marks, at Franchisee's cost or fair market value, whichever is less.   If the parties cannot agree on   fair   market   value   within   ten   (10)   days   from   the   date   of Franchisor's notice, an independent appraiser acceptable to Franchisee shall be designated by Franchisor, and his determination shall be binding.   If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee under this Agreement, and the cost of the appraisal, if any, against any payment therefor.

(j)   Franchisee hereby acknowledges that all telephone numbers used in the operation of the Franchisee Business constitute assets   of   the   Franchise   Business;   and   upon   termination   or   expiration of this Agreement Franchisee shall assign to Franchisor or

061198

its designee, all Franchisee's right, title, and interest in and to Franchisee's telephone numbers.

(k)  Franchisee shall comply with the covenants contained in Paragraph 13 of this Agreement.

14.  Covenants.

(a)  Unless otherwise specified, the term "Franchisee" as used in this Paragraph 14 shall include:

(i)  each person named as Franchisee herein; or,

(ii)  if Franchisee is a corporation, (1) all officers and directors of said corporation, (2) all holders of a beneficial interest of five percent (5%) or more of the securities of said corporation, and (3) all holders of a beneficial interest of ten percent (10%) or more of the securities of any corporation directly or indirectly controlling Franchisee; or,

(iii)  if Franchisee is a partnership, (1) each general partner, and (2) the officers, directors and holders of a beneficial interest of ten percent (10%) or more of any corporation which directly or indirectly controls any such general partner.

(b)  Franchisee (meaning the person named as Franchisee on page 1 of this Agreement if an individual) covenants that during the term of this Agreement and any renewals thereof, Franchisee shall devote his full time, energy, and best efforts, to the management and operation of the Franchise Business.

(c)  Franchisee covenants that during the term of this Agreement and any renewal thereof, Franchisee shall not fail, refuse nor neglect to make timely payments to its Customers in accordance with the terms of the agreements between Franchisee and its Customers or any agreements entered into on behalf of Franchisee between Franchisor or Checkcare USA and clients served by Franchisee.

(d)  Franchisee covenants that during the term of this Agreement and any renewals thereof, Franchisee shall not knowingly perform, directly or indirectly, any act injurious or prejudicial to Franchisor, other Franchisees of Franchisor, or to the goodwill associated with Franchisor's Proprietary Marks and the System.

(e)  Except as otherwise approved in writing by Franchisor, Franchisee covenants that during the term of this Agreement, any renewal thereof, and for a period of ten (10) years after the expiration or termination of same, Franchisee will not publish or otherwise disclose to any Competing Business, any Confidential Information or Trade Secrets.

061198

(f)   Franchisee covenants that during the term of this Agreement, any renewal thereof, and for a period of two (2) years after the expiration or termination of same, Franchisee will not employ or seek to employ or otherwise induce or seek to induce any person, who is at the time employed by Franchisor or by any other Franchisee of Franchisor, to leave his or her employment in order to enter into or become employed by a Competing Business; provided, however, that any violation of this covenant shall toll and suspend the effective period hereof during the period of said violation.

(g)   Franchisee covenants that during the term of this Agreement and any renewal thereof, Franchisee shall not for himself, or on behalf of any other person, persons, company, partnership or corporation divert or take away any customer of the Franchise Business.

(h)   Franchisee covenants that during the term of this Agreement and for a period of two (2) years after the expiration or termination of this Agreement, other than on behalf of the Franchise Business, Franchisee shall not (within the Franchise Area) for himself, or on behalf of any other person, persons, company, partnership, or corporation, solicit any customer of the Franchise Business; provided, however, that any violation of this covenant shall toll and suspend the effective period hereof during the period of said violation.   It is the intent of the parties hereto that by this subparagraph Franchisee shall be prohibited from pirating customers of the Franchise Business wherein such customers had business dealings or contacts with the Franchise Business during the twelve months preceding the termination or expiration of this Agreement; provided, however, it is expressly understood and agreed that Franchisee is not precluded hereby from soliciting or doing business with any such customer if such solicitation or business is unrelated to the Franchise Business.

(i)   Franchisee covenants that during the term of this Agreement, any renewal thereof, and for a period of two (2) years after the expiration or termination of same, Franchisee shall not (within the Franchise Area) for himself, or through, or on behalf of, or in conjunction with any person, persons, partnership, or corporation, compete against Franchisor or any other Franchisee of Franchisor by: (1)   engaging, as a principal, manager or in a supervisory capacity in any Competing Business, (2) by having an ownership interest in any Competing Business, or (3) by serving as an employee of or consultant to any Competing Business, wherein Franchisee would, in the regular and ordinary course of such employment or consultation, be called upon to reveal, base judgments upon, or otherwise use any Confidential Information or Trade Secrets that Franchisee received, obtained or acquired during, or as a consequence of conducting the Franchise Business, or wherein Franchisee would perform any substantial part of the activities enumerated as a part of the "Franchise Business" de-

061198

scribed in Paragraph 1. It is the intent of the parties hereto that by this Paragraph 14(h)(3) that Franchisee shall be restrained from using the Confidential Information, Trade Secrets, training, and customer goodwill gained by Franchisee as a result of Franchisee having participated in the Franchise Business, to injure the Franchisor or any other Franchisee of Franchisor in its ability to carry on its business and compete within the temporal and territorial limits described but not to prohibit Franchisee from employment with or consulting with a Competing Business in any other functional capacity (i.e., janitor, cashier, receptionist and the like).

(j) Franchisee covenants that during the term of this Agreement, any renewal thereof, and for a period of two (2) years after the expiration or termination of same, Franchisee shall not (within any area within which Franchisor has a Franchise operating) for himself, or through, or on behalf of, or in conjunction with any person, persons, partnership, or corporation, compete against Franchisor or any other Franchisee of Franchisor by: (1) engaging, as a principal, manager or in a supervisory capacity in any Competing Business, (2) by having an ownership interest in any Competing Business, or (3) by serving as an employee of or consultant to any Competing Business, wherein Franchisee would, in the regular and ordinary course of such employment or consultation, be called upon to reveal, base judgments upon, or otherwise use any Confidential Information or Trade Secrets that Franchisee received, obtained or acquired during, or as a consequence of conducting the Franchise Business, or wherein Franchisee would perform any substantial part of the activities enumerated as a part of the "Franchise Business" described in Paragraph 1. It is the intent of the parties hereto that by this Paragraph 14(i)(3) that Franchisee shall be restrained from using the Confidential Information, Trade Secrets, training, and customer goodwill gained by Franchisee as a result of Franchisee having participated in the Franchise Business, to injure the Franchisor or any other Franchisee of Franchisor in its ability to carry on its business and compete within the temporal and territorial limits described but not to prohibit Franchisee from employment with or consulting with a Competing Business in any other functional capacity (i.e., janitor, cashier, receptionist and the like).

(k) Franchisee agrees and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenants set forth in Paragraphs 14(a) through 14(j) of this Agreement or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof, and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Paragraph 19 hereof.

(l)     Franchisee agrees that each of the foregoing covenants are separate and independent from each other and from all other obligations of this Agreement and that they shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Paragraph 14 is held unreasonable or unenforceable by a court or agency having valid jurisdiction, Franchisee expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Paragraph 13.

(m)     Franchisee agrees and acknowledges that this Agreement and the covenants contained herein will not deprive him or her (where Franchisee is an individual) of his or her right to earn a living, and that he or she freely executes this Agreement, knowing and understanding the limitations and restrictions placed upon his or her post termination activities and employment.

(n)     Paragraphs 14(h) and (j) shall not apply to ownership by Franchisee of less than five percent (5%) beneficial interest in the outstanding equity securities of any corporation.

(o)     Franchisee agrees and acknowledges that Franchisor shall have the right to require all of Franchisee's employees performing managerial or supervisory functions and all employees receiving special training from Franchisor to execute covenants similar to those set forth herein in a form satisfactory to Franchisor.

(p)     Franchisee agrees and acknowledges that monetary damages as a result of a breach of the covenants contained in this Paragraph 14 will not alone provide an adequate remedy to Franchisor.  Accordingly, Franchisee agrees that any violation of the covenants contained herein would cause irreparable damage to Franchisor and that Franchisor shall be entitled to injunctive relief against Franchisee, including but not limited to a temporary restraining order, a temporary injunction, and a permanent injunction, enjoining and prohibiting any violation hereof. Franchisee specifically releases Franchisor from the requirement to post bond in connection with such injunctive relief.

15.   <u>Taxes, Permits, and Indebtedness</u>.

(a) Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the Franchise Business.

(b) In the event of any bona fide dispute as to liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchised Business, or any improvements thereon.

16. <u>Independent Contractor and Indemnification</u>.

(a) This Agreement does not create a fiduciary relationship between the parties hereto. Franchisee is and shall be an independent contractor, and nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever.

(b) During the term of this Agreement and any Renewal Term, Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor. Franchisee agrees to take such affirmative action as may be necessary to do so, including, without limitation, exhibiting a notice of that fact in a conspicuous place on the premises of the Franchise Business, the content of which Franchisor reserves the right to specify.

(c) It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name, and that Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action, or by reason of any act or omission of Franchisee in its conduct of the Franchise Business. Franchisee shall indemnify and hold Franchisor harmless from and against any and all damages, costs, expenses, actions, causes of action and claims arising directly or indirectly from, as a result of, or in connection with Franchisee's operation of the Franchise Business, including attorneys' fees, excepting only matters arising out of the alleged infringement by the Proprietary Marks of service marks or trade marks of third parties, matters arising out of the sole negligence of Franchisor, the breach of this Agreement by Franchisor or civil wrongs committed by Franchisor.

061198

17.  <u>Insurance</u>.

(a)  Franchisee shall procure, prior to the commencement of business, and maintain in full force and effect during the term of this Agreement, at Franchisee's expense, an insurance policy or policies protecting Franchisee and Franchisor, and their officers, directors, partners, and employees, against any loss, liability, personal injury, death, property damage, or expense whatsoever arising out of or occurring upon or in connection with the Franchise Business, as well as such other insurance applicable to such other special risks created by Franchisee's affiliated businesses, if any, as Franchisor may reasonably require for its own and Franchisee's protection.  Franchisor, and its officers, directors and employees, shall be named additional insureds in such policy or policies.

(b)  Such policy or policies shall be written by a responsible insurance company satisfactory to Franchisor in accordance with standards and specifications set forth in writing, and shall include, at a minimum (except as additional coverage and higher policy limits may reasonably be specified for all Franchisees from time-to-time by Franchisor in writing) the following:

(i)  Comprehensive general liability insurance with a combination of primary and excess limits of not less than One Million Dollars ($1,000,000), and automobile liability coverage for both owned and nonowned vehicles, with minimum limits of One Million Dollars ($1,000,000) per person/per occurrence for bodily injury, and One Hundred Thousand Dollars ($100,000) for property damage.

(ii)  Workmen's compensation and employer's liability insurance as well as such other insurance as may be required by statute or rule of the state in which the Franchise Business is located and operated.

(iii) Errors and omissions coverage for Franchisee, Franchisor's employees, and Checkcare USA with a limit of not less than Five Hundred Thousand and No/100 Dollars ($500,000).

(c)  Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve Franchisee of liability and obligation under the indemnity provisions set forth in this Agreement.

C0625-024
58841.5

(d)   Upon obtaining the insurance required by this Agreement and on each policy renewal date thereafter, Franchisee shall promptly submit evidence of satisfactory insurance and proof of payment therefor to Franchisor, together with, upon request, copies of all policies and policy amendments.  The evidence of insurance shall include a statement by the insurer that the policy or policies will not be canceled or materially altered without at least thirty (30) days prior written notice to Franchisor.

(e)   Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as revised from time-to-time for all Franchisees in writing, Franchisor shall have the right and authority (without, however, any obligation to do so), immediately to procure such insurance and to charge the same to Franchisee, which charges, together with a reasonable fee for Franchisor's expense in so acting, shall be payable by Franchisee immediately upon notice.

18.   Approvals and Waivers.

(a)   Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent shall be obtained in writing.  Franchisor shall give such response within ten (10) days from the date of its receipt of written notice or request from Franchisee.

(b)   Except as set forth herein with respect to the Proprietary Marks, Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason or any neglect, delay, or denial of any request therefor.

(c)   No failure of Franchisor to exercise any power or right reserved to it by this Agreement, or to insist upon strict compliance by Franchisee with any obligation or condition hereunder and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms herein. The waiver by Franchisor of any particular default by Franchisee shall not affect or impair Franchisor's rights with respect to any subsequent default of the same, similar, or different nature, nor shall any delay, forbearance, or omission of Franchisor to exercise any power or right arising out of any breach or default by Franchisee of any of the terms, provisions, or covenants hereof, affect or impair Franchisor's right to exercise the same, nor shall such constitute

061198

a waiver by Franchisor of any right hereunder, or the right to declare any subsequent breach or default and to terminate this Agreement prior to the expiration of its term. Subsequent acceptance by Franchisor of any payments due it hereunder (or the acceptance of partial payments) shall not be deemed to be a waiver by Franchisor of any prior breach by Franchisee of any terms, covenants, or conditions of this Agreement.

19. <u>Notices</u>. Any and all notices required or permitted under this Agreement shall be in writing and shall either be (i) personally delivered, (ii) delivered by a reputable messenger service (such as Federal Express, Emery, United Parcel Service, etc.), (iii) transmitted via FAX with verbal confirmation of receipt, or (iv) or mailed by certified or registered mail, return receipt requested, postage prepaid, to the respective parties at the addresses set forth below, unless and until a different address has been designated by written notice to the other party in the manner set forth herein. Any such notice shall be deemed to be given on the date (i) personally delivered, (ii) delivered to the recipient by the messenger service, (iii) received via FAX if during normal business hours, and if not, then receipt shall be deemed to have been made at the opening of business on the next business day, or (iv) on the next day following the date mailed, if mailed.

<pre>
Notices to Franchisor:   Checkcare Enterprises, Inc.
                         P.O. Box 9636
                         Columbus, Georgia  31908
                         Attention:  President

Notice to Franchisee:    S&D Holdings, LLC DBA
                         Checkcare Systems Memphis
                         4821 American Way #201
                         Memphis, TN 38118
</pre>

20. <u>Entire Agreement</u>. This Agreement, the documents referred to herein, and the Exhibits hereto, if any, constitute the entire, full, and complete Agreement between Franchisor and Franchisee concerning the subject matter hereof, and supersede all prior agreements, no other representations having induced Franchisee to execute this Agreement. No representations, inducements, promises, or agreements, oral or otherwise, not embodied in this Agreement (as defined in the preceding sentence), or set forth in Franchisor's Uniform Franchise Offering Circular delivered to Franchisee, or attached hereto (unless of subsequent date) were made by either party, and none shall be of any force and effect with reference to this Agreement or otherwise. No amendment, change, or variance from this Agreement shall be binding on either

C0625-024
58841.5

061198

party unless mutually agreed to by the parties and executed by the parties in writing.

   21.  <u>Severability and Construction</u>.

      (a)  Except as expressly provided to the contrary herein, each section, part, term, and/or provision of this Agreement shall be considered severable; and if, for any reason, any section, part, term, and/or provision herein is determined by a court or agency having valid jurisdiction to be invalid and contrary to, or in conflict with, any applicable law or regulation such determination shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, and/or provisions of this Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid sections, parts, terms, and/or provisions shall be deemed not to be a part of this Agreement.

      (b)  Anything to the contrary herein notwithstanding, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisor or Franchisee and such of their respective successors and assigns as may be contemplated by Paragraph 11 hereof, any rights or remedies under or by reason of this Agreement.

      (c)  Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

      (d)  All captions in the Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provisions hereof.

      (e)  All references herein to the masculine, feminine, neuter, plural or singular shall be construed to include the masculine, feminine, neuter, plural or singular, all as the context may require, and all acknowledgements, promises, covenants, agreements, and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all the parties hereto on behalf of Franchisee.

061198

(f)  This Agreement may be executed in multiple copies, and each copy so executed shall be deemed an original.

22.  <u>Mediation/Arbitration of Disputes</u>.

(a)  Mediation.  Except as otherwise provided herein, with respect to any dispute, claim or controversy arising out of or relating to this Agreement, or any breach thereof, either party to this Agreement may, before any arbitration proceeding takes place, submit the controversy or claim to non-binding mediation before the Center for Public Resources - National Franchise Mediation Program, FAM, the American Arbitration association, or another mutually agreeable mediator.  Both parties will execute a confidentiality agreement reasonably satisfactory to Franchisor.  Upon submission, the obligation to attend mediation is binding on both parties. Each party will bear its own costs for the mediation, except the mediation fee, and the fee for the mediator will be split equally. Any disputes, claim or controversy relating to Franchisee's obligation to make any financial payments to Franchisor or a customer of Franchisee shall be specifically excluded from the provisions of this Paragraph 22(a).

(b)  Arbitration.

(i) Except as otherwise provided in this Paragraph 22, any controversy or claim arising out of or relating to this Agreement, or any breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  Any claim or controversy arising out of or relating to Paragraphs 12 and 13 hereof, or the breach thereof, shall be specifically excluded from the provisions of this Paragraph 22(b).

(ii) All claimants with substantially similar claims may join the arbitration proceedings provided that the party (or parties) which does not prevail in the arbitration proceeding shall bear the cost of the other party's (or parties') attorneys' fees and all other costs incurred by such party (or parties) by participating in the arbitration proceeding.

(iii) If Franchisee initiates arbitration, the arbitration shall be held in Columbus, Georgia.  If Franchisor initiates arbitration, the arbitration shall be held within Franchisee's Franchise Area.

(iv) Nothing herein contained shall prevent or bar either party from obtaining injunctive relief against any anticipa-

tory breach or threatened conduct that will cause irreparable loss or damage, under the usual rules in equity.

(c)  All claimants with substantially similar claims may join the proceedings.

23.  <u>Applicable Law, Etc</u>.

(a)  This Agreement takes effect upon its acceptance and execution by Franchisor and shall be interpreted and construed under laws of the State of Georgia.  In the event of any conflict of law, the laws of Georgia shall prevail (without regard to, and without giving effect to, the application of Georgia Conflict of Law Rules), except to the extent governed by the US Trademark Act of 1946, 15 U.S.C. §1051, <u>et. seq</u>.  Nothing in this Paragraph 23(a) is intended by the parties to subject this Agreement to any franchise or similar law, rule, or regulation of the State of Georgia to which it would not otherwise be subject.

(b)  Any action (whether or not arising out of this Agreement) brought by Franchisee against Franchisor in any court, whether federal or state, shall be brought, and any action brought by Franchisor against Franchisee may be brought, in the judicial district in which Franchisor has its principal place of business. The parties hereby waive all questions of personal jurisdiction or venue for the purposes of carrying out this provision.

(c)  No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

(d)  Nothing herein contained shall bar Franchisor's right to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

(e)  Franchisor and Franchisee hereby waive to the fullest extent permitted by law any right to or claim of any consequential, punitive, or exemplary damages against the other, and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.

24.  <u>Attorneys' Fees</u>.  Should either party institute legal proceedings to enforce the terms or conditions of this Agreement, the prevailing party shall be entitled to recover all its

reasonable expenses, including attorneys' fees, costs, and other expenses reasonably and necessarily incurred.

25.  <u>Survival of Covenants and Conditions</u>.  All covenants and conditions relating to the rights and obligations of Franchisee and Franchisor subsequent to the termination of this Agreement shall survive the termination and shall continue in full force and effect in accordance with the terms of the specific provision.

26.  <u>Acknowledgements</u>.

(a)  Franchisee acknowledges that it has conducted an independent investigation of the Franchise Business, and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee as an independent businessman.  Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

(b)  Franchisee acknowledges that it has received, read, and understood this Agreement, the Exhibits hereto, if any; and that Franchisor has fully and adequately explained the provisions of each to Franchisee's satisfaction; and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors or its own choosing about the potential benefits and risks of entering into this Agreement.

(c)  Franchisee acknowledges that other franchisees of Franchisor have or will be granted franchises at different times and in different situations, and further acknowledges that the provisions of such franchises may vary substantially from those contained in this Agreement and that Franchisee's obligations hereunder may differ substantially form those of other franchisees of Franchisor.

(d)  Franchisee does by execution of this Agreement acknowledge that Franchisee received a copy of this Agreement and Franchisor's Uniform Franchise Offering Circular on the earlier of ten (10) business days prior to the date on which this Agreement was executed, ten (10) business days before any payment was made by Franchisee to Franchisor, or at the first personal meeting with Franchisor.

C0625-024
58841.5

39

061198

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Agreement on the day and year first above written.

FRANCHISEE:

NAME: S+D Holdings, LLC

By: _S.E. Delmuto_

Its _____

Attest: _____

Its _____

(CORPORATE SEAL)

FRANCHISOR:

CHECKCARE ENTERPRISES, INC.

By: _____

Its: Senior VP

Attest: Charles R Hobble

Its: Senior VP

(CORPORATE SEAL)

C0625-024
58841.5

40

061198

## INDIVIDUAL GUARANTY

Each of the undersigned owns a five percent (5%) or greater benefi-
cial interest in Franchisee; each has read this Franchise Agreement; and
each agrees to be individually, jointly and severally liable for the
performance of Franchisee's obligations to Customers of Franchisee in
accordance with the terms of the Agreements between Franchisee and its
clients or any agreements entered into on behalf of Franchisee between
Franchisor or Checkcare USA and Customers served by Franchisee.

_____
Witness

_____
Print Name: Susan Perlmutter

_____
Witness

_____
Print Name: _____

_____
Witness

_____
Print Name: _____

C0625-024
58841.5

41

(CORPORATE ACKNOWLEDGEMENT)

STATE OF _____
COUNTY OF _____

    I, the undersigned Notary Public in and for said County, in said State, hereby certify that _____ and _____, whose names as _____ are have properly identified themselves to me, acknowledged before me ___ this day that, being informed of the contents of said Franchise Agreement, they, as such officers and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and official seal this the _____ day of _____, 19____.


_____
NOTARY PUBLIC

(NOTARIAL SEAL)

My Commission Expires:



(INDIVIDUAL ACKNOWLEDGEMENT)

STATE OF _Tennessee_
COUNTY OF _Shelby_

    I, the undersigned Notary Public in and for said County, in said State, hereby certify that _Susan Perlmutter_, who has properly identified himself to me, acknowledged before me on this day that, being informed of the contents of said Franchise Agreement, he/she executed the same voluntarily.

    Given under my hand and official seal this the _8th_ day of _May_, 19___ _2000_.

_____
NOTARY PUBLIC

(NOTARIAL SEAL)
My Commission Expires:

C0625-024
58841.5

42

TONI KELLER
MY COMM. EXP
NOTARY
PUBLIC
AT LARGE
5-12-2002
SHELBY CO. TN

EXHIBIT "D"

## NONCOMPETITION AND NONDISCLOSURE AGREEMENT

THIS AGREEMENT, made and entered into this _____ day of _____, 19____, between _____ (hereinafter called the "Employer"), and _____, a _____ and employee of Employer (hereinafter called "Employee");

### W I T N E S S E T H :

WHEREAS, Employer is a franchisee of Checkcare Enterprises, Inc. ("Checkcare"); and

WHEREAS, pursuant to the Franchise Agreement between Employer and Checkcare (the "Franchise Agreement"), Employer is prohibited from competing with Checkcare or disclosing confidential information of Checkcare in the Franchise Area (as hereinafter defined) during the term of the Franchise Agreement and for a period of two (2) years thereafter; and

WHEREAS, pursuant to the Franchise Agreement, Checkcare has required Employer to enter into similar agreements with certain employees of Employer;

NOW, THEREFORE, in consideration of Employer's hiring Employee as an employee of Employer with the benefits to Employee arising therefrom, the Employee and Employer agree as follows:

1.   <u>Definitions</u>.

"Checkcare System" shall mean the check collection, check guarantee and check verification business utilizing Checkcare's unique system of operation, including the methods of marketing said services, as the same may be changed, improved and developed by Checkcare from time to time.

"Competing Business" shall mean any person, concern or entity which is engaged in or conducts or plans to engage in or conduct (within the Franchise Area) a business substantially the same as the Franchise Business.

"Confidential Information" shall mean any data or information disclosed to, acquired by Employee from Employer or as a result of Employee's connection with the Franchise Business, and not generally known to or by a Competing Business about the Franchise Business, which shall include, without limitation, the Checkcare System, together with knowledge and know-how relating to accounting, marketing, check collection, check guarantee and check verification procedures, customer lists, customer account records, training and operations material and memoranda and any other information treated by Employer or Checkcare as being confidential

or labeled "confi...ntial", as well as all physical embodiments of the foregoing.

"Franchise Area" shall mean the geographical area of Employer's franchise with Checkcare as outlined and described on Exhibit A to the Franchise Agreement, a copy of which has been given to Employee.

"Franchise Business" shall mean the performance of check collection, check guarantee and check verification services by Employer utilizing the Checkcare System, including, without limitation, Employer's marketing of said services and its use of Checkcare's proprietary marks and printed materials.

"Trade Secrets" shall mean the whole or any part or phase of any information, procedure, design, technology, method or system which is used by and known only to Checkcare and its franchisees and disclosed to Employer and which gives Employer and other franchisees of Checkcare an advantage over competitors who do not know or use it.

2. <u>Confidential Information</u>. Employee shall not, during the term of this Agreement, any renewal hereof, or for a period of one (1) year after the expiration or termination of same, communicate, divulge, or use for the benefit of any other person, persons, partnership, association, or corporation any Confidential Information which may be communicated to Employee, or of which Employee may be apprised, by virtue of Employee's operation under the Franchise Business. Any and all information, knowledge, and know-how, including, without limitation, forms, letters, contracts, techniques, computer software programs and other data, which Employer designates as "confidential" shall be deemed confidential for purposes of this Agreement, except information which Employer can demonstrate came to Employee's attention prior to disclosure thereof by Employer.

3. <u>Employee's Covenants</u>.

(a) Employee covenants that during the term of this Agreement and any renewals thereof, Employee shall not perform, directly or indirectly, any act injurious or prejudicial to Employer or to the goodwill associated with the Franchise Business.

(b) Employee covenants that during the term of this Agreement, any renewal thereof, and for a period of one (1) year after the expiration or termination of same, Employee will not publish or otherwise disclose to any Competing Business, any Confidential Information or Trade Secrets.

(c) Employee covenants that during the term of this Agreement, any renewal thereof, and for a period of one (1) year after the expiration or termination of same, Employee will not employ or seek to employ or otherwise, directly or indirectly, induce or seek to induce any person, who is at the time employed by

Employer, to leave his or her employment in order to enter into or become employed by a Competing Business; provided, however, that any violation of this covenant shall toll and suspend the effective period hereof.

(d) Employee covenants that during the term of this Agreement and any renewal thereof, Employee shall not for himself, or on behalf of any other person, persons, company, partnership or corporation divert or take away any customer of the Franchise Business within the Franchise Area.

(e) Employee covenants that for a period of one (1) year after the expiration or termination of this Agreement, Employee shall not, within the Franchise Area, for himself, or on behalf of any other person, persons, company, partnership, or corporation, solicit any customer of the Franchise Business; provided, however, that any violation of this covenant shall toll and suspend the effective period hereof. It is the intent of the parties hereto that by this subparagraph Employee shall be prohibited from pirating customers of the Franchise Business wherein such customers had business dealings or contacts with the Franchise Business during the twelve (12) months preceding the termination or expiration of this Agreement; provided, however, it is expressly understood and agreed that Employee is not precluded hereby from soliciting or doing business with any such customer if such solicitation or business is unrelated to the Franchise Business.

(f) Employee covenants that during the term of this Agreement, any renewal thereof, and for a period of one (1) year after the expiration or termination of same, Employee shall not, within the Franchise Area, for himself, or through, or on behalf of, or in conjunction with any person, persons, partnership, or corporation, compete against Employer by: (1) engaging, as a principal, manager or in a supervisory capacity in any Competing Business, (2) by having an ownership interest in any Competing Business, or (3) by serving as an employee of or consultant to any Competing Business, wherein Employee would, in the regular and ordinary course of such employment or consultation, be called upon to reveal, base judgments upon, or otherwise use any Confidential Information or Trade Secrets that Employee received, obtained or acquired during, or as a consequence of Employee's employment with Employer in the operation of the Franchise Business, or wherein Employee would perform any substantial part of the activities enumerated as a part of the "Franchise Business" described in Paragraph 1. It is the intent of the parties hereto that by this Paragraph 3(f)(3) that Employee shall be restrained from using the Confidential Information, Trade Secrets, training, and customer goodwill gained by Employee as a result of Employee's having participated in the Franchise Business, to injure the Employer in its ability to carry on its business and compete within the temporal and territorial limits described, but not to prohibit Employee from employment with or consulting with a Competing Business in any other functional capacity (i.e., janitor, cashier, receptionist and the like).

C0625-024
59264.2

EXHIBIT "D"

D-3

(g) Employee agrees and acknowledges that Employer shall have the right, in its sole discretion, to reduce the scope of any covenants set forth in this Paragraph 3 or any portion thereof, without Employee's consent, effective immediately upon receipt by Employee of written notice thereof, and Employee agrees that Employee shall comply forthwith with any covenant as so modified, which shall be fully enforceable.

(h) Employee agrees that each of the foregoing covenants are separate and independent from each other and from all other obligations of this Agreement and that they shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Paragraph 3 is held unreasonable or unenforceable by a court or agency having valid jurisdiction, Employee expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Paragraph 3.

(i) Employee agrees and acknowledges that this Agreement and the covenants contained herein will not deprive Employee of his or her right to earn a living, and that he or she freely executes this Agreement, knowing and understanding the limitations and restrictions placed upon his or her post termination activities and employment.

(j) Employee agrees and acknowledges that monetary damages as a result of a breach of the covenants contained in this Paragraph 3 will not alone provide an adequate remedy to Employer. Accordingly, Employee agrees that any violation of the covenants contained herein would cause irreparable damage to Employer and that Employer shall be entitled to injunctive relief against Employee, including but not limited to a temporary restraining order, a temporary injunction, and a permanent injunction, enjoining and prohibiting any violation hereof. Employee specifically releases Employer from the requirement to post bond in connection with such injunctive relief.

4. <u>Notices</u>. Any notice required or permitted to be given to one party by the other party hereto pursuant to this Agreement shall be in writing and shall be personally delivered or sent by United States Mail, certified or registered, return receipt requested, first class postage and charges prepaid, in envelopes addressed to the parties as follows:

<u>Employee:</u>

<u>Employer:</u>

C0625-024
59254.2

EXHIBIT "D"
D-4

or at such other addresses as shall be designated in writing as aforesaid by either party to the other party hereto. Notices delivered in person shall be effective on the date of delivery. Notices sent by United States Mail shall be effective one (1) day after the date of mailing in the manner provided above.

5.   <u>Assignment</u>.   This Agreement may be assigned by Employer to any subsidiary or successor; provided, that in the event of any such assignment, Employer shall obtain an instrument in writing from such assignee assuming the obligations of Employer hereunder and shall deliver an executed copy thereof to Employee.   In the event of any such assignment, Employer shall remain liable only for obligations of Employer arising prior to the date of the assignment and will be relieved of liability under this Agreement arising after the date of any such assignment.

6.   <u>Other Rights; Amendments</u>.   The rights of Employer under this Agreement to protect its Confidential Information, Trade Secrets, business records and other proprietary interests are in addition to, and not in lieu of, all other rights Employer may have by agreement, at law or in equity, to protect its confidential information, trade secrets and other proprietary interests.   No amendment or modification of this Agreement shall be valid or binding upon Employer unless made in writing and signed by a duly authorized officer of Employer, or upon Employee unless made in writing and signed by Employee.

7.   <u>Term</u>.   This Agreement shall be for a term commencing on the date hereof and terminating on the date of the termination of Employee's employment with Employer.

8.   <u>Waiver</u>.   The waiver by one party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach of the same or any other provision by the other party.

9.   <u>Governing Law</u>.   This Agreement shall be construed in accordance with the laws of the State in which Employer has its principal office.

10.   <u>Third Party Beneficiary</u>.   Employee and Employer acknowledge that Checkcare is a beneficiary of the rights of Employer hereunder.   In the event of a breach by Employee of Employee's obligations hereunder, Employer shall give written notice of said breach to Checkcare, and Checkcare shall have the right, but not the obligation, to take any and all such action as Checkcare may deem necessary or appropriate to enforce its rights hereunder and to protect the Checkcare System.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and have affixed their seals as of the date first above written.

EMPLOYER:

_____ (L.S.)

EMPLOYEE:

_____ (L.S.)

C0625-024
59264.2

EXHIBIT "D"
D-6

EXHIBIT "E"

<u>PROMISSORY NOTE</u>

$_____                                                    Columbus, Georgia
                                                            _____, 19___

    FOR VALUE RECEIVED, _____,
_____ (hereinafter referred
to as "Maker"), promises to pay to the order of CHECKCARE ENTER-
PRISES, INC., a Georgia corporation (hereinafter, together with any
assignee or holder hereof, referred to as "Holder"), at P. O. Box
9636, Columbus, Georgia 31908, or at such other place as Holder may
designate by giving written notice to Maker at the address set
forth below, the principal amount of _____
                                                            ($_____)
Dollars, with the simple interest thereon at the rate of twelve
(12%) percent per annum. Interest shall be computed for each day
during the term of this Note by multiplying the outstanding
principal balance hereunder at the close of business on that day by
a daily interest factor, which daily interest factor shall be
calculated by dividing the aforesaid interest rate per annum in
effect on that day by 365 days. Interest so computed shall accrue
for each and every day on which any indebtedness remains outstand-
ing hereunder.

    Principal shall be due and payable in annual installments of
_____ ($_____) one (1) year
from the date hereof, _____
_____ ($_____) two (2) years from
the date hereof, and _____
                      ($_____) three (3) years from
the date hereof. Accrued interest on the outstanding principal
balance at the aforesaid rate shall be due and payable on the same
day as each installment of principal shall be due and payable.

    The indebtedness evidenced by this Note may be prepaid, either
in whole or in part, without penalty, at any time. Any prepayment
shall be applied first to accrued interest outstanding on the
unpaid balance of this Note as of the date of said prepayment, then
to the outstanding principal balance of installments in the order
of maturity.

    Time is of the essence hereof.

    If any default is made in the payment of principal or interest
as stipulated above and such default is not cured within ten (10)
days thereafter, then Holder may, at Holder's option, declare the
unpaid principal balance of this Note and all accrued interest
thereon, immediately due, payable and collectible. The failure of
Holder to exercise this option shall not constitute a waiver of the
right to exercise the same in the event of any subsequent default.

C0625-024
59264.2

EXHIBIT "E"
E-1

The indebtedness evidenced by this Note and the obligations created hereby are given to evidence the obligation of Maker for the payment of the remaining initial franchise fee as provided in the Checkcare Systems' Franchise Agreement between Maker and Holder, dated of even date herewith.   The default by Maker hereunder constitutes a default under the Checkcare Systems' Franchise Agreement giving Holder the right to terminate the Checkcare Systems' Franchise Agreement as provided therein.

In the event that all or any portion of principal or interest hereunder remains unpaid after the same becomes due and payable, whether at stated maturity, by acceleration, or otherwise, any such sums shall bear interest at the rate equal to two (2) percentage points per annum in excess of the interest rate set forth above from the due date until paid.

Every notice, demand, consent or other communication authorized or required by this Note shall be in writing and shall be deemed to be given when hand delivered or when deposited in the United States registered or certified mail, return receipt requested, with postage prepaid, and addressed:

    <u>If to Holder</u>:   Checkcare Enterprises, Inc.
                      P. O. Box 9636
                      Columbus, Georgia  31908
                      Attention:  President

    <u>If to Maker</u>:   _____
                      _____
                      _____
                      _____

or at such other address as either party may from time to time designate in writing.

Maker hereby waives and renounces any and all exemptions granted to Maker under the Constitution and laws of the United States or any state as against this debt or any renewal or extension thereof, and further waives presentment, demand, protest, and notice of dishonor, protest and non-payment except such notice as may be otherwise required herein.

If any part of the indebtedness evidenced hereby, is collected by or through an attorney-at-law, Maker agrees to pay reasonable attorney's fees and all other expenses and costs of collection.

If from any circumstances whatsoever, the fulfillment of any provision of this Note or of any other instrument evidencing or securing the indebtedness evidenced hereby, at the time performance of such provision shall be due, shall involve transcending the limit of validity presently prescribed by any applicable usury

EXHIBIT "E"
E-2

statute or any other applicable law with regard to obligations of like character and amount, then _ipso_ _facto_, the obligation to be fulfilled shall be reduced to the limit of such validity, so that in no event shall any exaction be possible under this Note or under any other instrument evidencing or securing the indebtedness evidenced hereby that is in excess of the current limit of such validity, but such obligation shall be fulfilled to the limit of such validity.   In the event of any such reduction of said obligation, the unpaid principal balance of this Note, together with all accrued interest thereon and any other sums advanced hereunder or under any instruments securing the indebtedness evidenced hereby, shall, at the option of Holder, become immediately due and payable.

This Note shall be construed according to the laws of the State of Georgia.

IN WITNESS WHEREOF, Maker has executed this Promissory Note, under seal, the day and year first above written.


_____ (L.S.)

EXHIBIT "E"
E-3

EXHIBIT "F"


FRANCHISOR'S AGENT
IN EACH STATE AUTHORIZED TO
RECEIVE SERVICE OF PROCESS


ALABAMA

The Prentice-Hall Corporation System, Inc.
57 Adams Avenue
Montgomery, Alabama  36104

ARKANSAS

The Prentice-Hall Corporation System
Union National Bank Building
Little Rock, Arkansas  72201

FLORIDA

The Prentice-Hall Corporation System, Inc.
Suite 420
First Florida Bank Building
Tallahassee, Florida  32301

GEORGIA

F. Steve Taylor
3907 Macon Road
Columbus, Georgia  31907

INDIANA

The Prentice-Hall Corporation System, Inc.
600 Circle Tower
Indianapolis, Indiana  46204

KANSAS

Prentice-Hall Corporation System, Kansas, Inc.
Suite 1108
534 South Kansas Avenue
Topeka, Kansas  66603

KENTUCKY

The Prentice-Hall Corporation System, Inc.
326 West Main Street
Frankfort, Kentucky 40601

LOUISIANA

The Prentice-Hall Corporation System, Inc.
1006 Hibernia Bank Building
New Orleans, Louisiana 70112-1408

MARYLAND

The Prentice-Hall Corporation System, Inc.
1123 North Eutaw Street
Baltimore, Maryland 21201

MICHIGAN

The Prentice-Hall Corporation System, Inc.
501 South Capital Avenue
Lansing, Michigan  48933

MINNESOTA

The Prentice-Hall Corporation System, Inc.
Multifoods Tower
33 South Sixth Street
Minneapolis, Minnesota 55402

MISSISSIPPI

The Prentice-Hall Corporation System, Inc.
1700 Deposit Guaranty Plaza
Post Office Box 22567
Jackson, Mississippi  39225-2567

MISSOURI

The Prentice-Hall Corporation System, Inc.
304 East High Street
Jefferson City, Missouri  65101

NEW YORK

Secretary of State
162 Washington Avenue
Albany, New York 12231

EXHIBIT "F"
F-2

NORTH CAROLINA

The Prentice-Hall Corporation System, Inc.
1300 St. Mary's Street
Raleigh, North Carolina   27605

OHIO

The Prentice-Hall Corporation System, Inc.
380 South 5th Street
Columbus, Ohio 43215

OKLAHOMA

The Prentice-Hall Corporation System, Inc.
115 South West 89th Street
Oklahoma City, Oklahoma   73139-8511

PENNSYLVANIA

The Prentice-Hall Corporation System, Inc.
100 Pine Street
Harrisburg, Pennsylvania   17108

SOUTH CAROLINA

The Prentice-Hall Corporation System, Inc.
2019 Park Street
Columbia, South Carolina   29201

TENNESSEE

The Prentice-Hall Corporation System, Inc.
Maclellan Building, Third Floor
722 Chestnut Street
Chattanooga, Tennessee   37402

TEXAS

The Prentice-Hall Corporation System, Inc.
400 North St. Paul Street
Dallas, Texas   75201

VIRGINIA

The Prentice-Hall Corporation System, Inc.
11 South 12th Street
Richmond, Virginia   23219

1997

Checkcare Enterprises, Inc.
Gross Revenue Report

| Office | MIB | Annual Premium | % GR | Guaranteed Ser Charge | % GR | Non-Guar Ser Charge | % GR | Non-Guar % Retained | % GR | Total YTD Revenue |
|--------|-----|---------------|------|----------------------|------|--------------------|------|--------------------|------|-------------------|
| CE000001 | 180 | 81192.36 | 11.86 | 427152.23 | 62.41 | 164557.70 | 24.04 | 8972.12 | 1.31 | 684478.61 |
| CE000002 | 130 | 150908.53 | 14.68 | 574337.31 | 55.86 | 249621.27 | 24.28 | 19423.21 | 1.89 | 1028227.85 |
| CE000003 | 111 | 408312.66 | 21.00 | 835441.12 | 42.96 | 398700.66 | 20.50 | 90722.13 | 4.67 | 1944693.11 |
| CE000005 | 139 | 195731.06 | 22.74 | 361918.11 | 42.05 | 233536.44 | 27.13 | 16939.58 | 1.97 | 860695.96 |
| CE000006 | 128 | 279554.43 | 31.61 | 219451.70 | 24.81 | 310751.68 | 35.14 | 26120.35 | 2.95 | 884398.61 |
| CE000007 | 124 | 70926.58 | 15.16 | 62562.34 | 13.37 | 288490.20 | 61.67 | 43583.79 | 9.32 | 467773.28 |
| CE000009 | 129 | 186460.49 | 27.91 | 216830.69 | 32.46 | 207835.24 | 31.11 | 28413.07 | 4.25 | 668013.50 |
| CE000010 | 136 | 55884.12 | 7.89 | 317709.66 | 44.83 | 294398.46 | 41.54 | 20790.00 | 2.93 | 708663.95 |
| CE000011 | 139 | 103385.30 | 9.21 | 594119.90 | 52.92 | 350834.83 | 31.25 | 13452.12 | 1.20 | 1122770.76 |
| CE000012 | 139 | 110073.82 | 12.64 | 487032.87 | 55.95 | 217095.16 | 24.94 | 8053.60 | 0.93 | 870529.88 |
| CE000013 | 139 | 24599.68 | 5.00 | 299105.37 | 60.77 | 161220.64 | 32.75 | 2121.80 | 0.43 | 492209.28 |
| CE000014 | 120 | 221634.34 | 12.22 | 1086137.88 | 59.87 | 446982.63 | 24.64 | 22098.81 | 1.22 | 1814290.34 |
| CE000015 | 101 | 63152.89 | 9.36 | 278964.92 | 41.34 | 316921.31 | 46.96 | 10450.01 | 1.55 | 674829.61 |
| CE000016 | 119 | 163132.04 | 14.80 | 620461.55 | 56.28 | 278321.13 | 25.24 | 11573.55 | 1.05 | 1102502.60 |
| CE000017 | 115 | 125570.70 | 19.03 | 279066.49 | 42.29 | 166041.17 | 25.16 | 12599.36 | 1.91 | 659943.81 |
| CE000020 | 127 | 80910.26 | 6.07 | 596319.71 | 44.70 | 449336.85 | 33.69 | 45606.22 | 3.42 | 1333910.24 |
| CE000021 | 114 | 42084.52 | 11.44 | 139953.88 | 38.03 | 173914.23 | 47.26 | 1270.44 | 0.35 | 368019.56 |
| CE000022 | 114 | 16945.56 | 12.40 | 81092.64 | 59.33 | 37775.98 | 27.64 | 136.08 | 0.10 | 136678.03 |
| CE000024 | 111 | 98245.13 | 12.99 | 348248.58 | 46.06 | 222717.80 | 29.46 | 12936.82 | 1.71 | 756034.31 |
| CE000025 | 155 | 41529.17 | 8.37 | 281727.35 | 56.79 | 166247.46 | 33.51 | 2736.65 | 0.55 | 496091.14 |
| CE000026 | 135 | 107600.39 | 10.49 | 504836.06 | 49.22 | 399521.56 | 38.95 | 5242.55 | 0.51 | 1025719.55 |
| CE000027 | 96 | 91613.93 | 21.02 | 118494.88 | 27.18 | 197137.82 | 45.23 | 22204.21 | 5.09 | 435893.16 |
| CE000028 | 95 | 314266.06 | 19.85 | 789848.16 | 49.88 | 409179.85 | 25.84 | 60556.31 | 3.82 | 1583561.07 |
| CE000029 | 92 | 147308.93 | 12.10 | 593880.12 | 48.79 | 314837.16 | 25.87 | 22952.59 | 1.89 | 1217231.86 |
| CE000030 | 89 | 137824.82 | 21.00 | 175872.89 | 26.80 | 288032.87 | 43.89 | 40519.13 | 6.17 | 656212.31 |
| CE000032 | 89 | 167929.60 | 11.54 | 538287.36 | 37.01 | 626942.78 | 43.10 | 65246.30 | 4.49 | 1454623.32 |
| CE000034 | 82 | 152988.97 | 36.75 | 150882.92 | 36.24 | 80338.11 | 19.30 | 17331.80 | 4.16 | 416300.42 |
| CE000035 | 81 | 130066.11 | 9.08 | 893738.87 | 62.42 | 361710.63 | 25.26 | 10177.93 | 0.71 | 1431861.58 |
| CE000037 | 80 | 153651.72 | 8.83 | 743942.13 | 42.73 | 796915.75 | 45.78 | 4856.63 | 0.28 | 1740885.61 |
| CE000038 | 77 | 188662.56 | 12.95 | 243935.03 | 16.75 | 262734.17 | 18.04 | 18980.27 | 1.30 | 1456511.21 |
| CE000039 | 78 | 227948.23 | 26.52 | 220414.18 | 25.64 | 298556.36 | 34.74 | 61175.24 | 7.12 | 859522.37 |
| CE000040 | 76 | 111204.54 | 15.58 | 324539.17 | 45.46 | 164173.38 | 23.00 | 27959.99 | 3.92 | 713938.53 |
| CE000041 | 78 | 153395.57 | 12.91 | 435467.31 | 36.65 | 502552.18 | 42.29 | 28220.91 | 2.37 | 1188305.45 |
| CE000042 | 73 | 147802.64 | 17.47 | 303402.69 | 35.86 | 313104.11 | 37.01 | 12531.42 | 1.48 | 846008.19 |
| CE000043 | 70 | 64282.92 | 26.00 | 84324.11 | 34.10 | 76464.75 | 30.93 | 6511.69 | 2.63 | 247250.85 |
| CE000044 | 68 | 130206.81 | 14.59 | 457662.07 | 51.28 | 223477.36 | 25.04 | 7967.57 | 0.89 | 892436.89 |
| CE000045 | .00 | 64308.69 | 10.53 | 234766.48 | 38.43 | 291109.20 | 47.65 | 857.93 | 0.14 | 610938.27 |
| CE000046 | 69 | 196472.48 | 12.08 | 760653.69 | 46.77 | 561397.64 | 34.52 | 41534.82 | 2.55 | 1626362.91 |
| CE000047 | 68 | 101851.52 | 10.45 | 560132.72 | 57.48 | 209364.33 | 21.48 | 5801.70 | 0.60 | 974504.64 |
| CE000051 | 65 | 293570.60 | 19.59 | 625968.54 | 41.76 | 520595.36 | 34.73 | 11524.44 | 0.77 | 1498826.83 |
| CE000052 | 58 | 97739.63 | 16.73 | 199305.54 | 34.11 | 260915.15 | 44.66 | 7178.30 | 1.23 | 584249.33 |
| CE000053 | 56 | 190975.22 | 12.65 | 631095.90 | 41.79 | 543671.78 | 36.00 | 109800.27 | 7.27 | 1510112.22 |
| CE000054 | .00 | 52904.33 | 11.78 | 211199.23 | 47.04 | 147089.36 | 32.76 | 11905.29 | 2.65 | 448994.31 |
| CE000055 | 153 | 73727.45 | 10.84 | 241033.05 | 35.45 | 267658.61 | 39.37 | 89489.75 | 13.16 | 679923.94 |
| CE000056 | 41 | 105509.33 | 22.99 | 191574.83 | 41.74 | 151962.03 | 33.11 | 6971.22 | 1.52 | 458961.32 |
| CE000060 | 33 | 35532.44 | 12.77 | 129316.48 | 46.46 | 92102.55 | 33.09 | 20858.96 | 7.49 | 278358.20 |
| CE000065 | 40 | 81969.53 | 11.62 | 358582.07 | 50.83 | 257367.69 | 36.49 | 1478.29 | 0.21 | 705400.51 |

Exhibit "G"

```
PAGE NO.    2                                    1997
04/20/98
```

### Checkcare Enterprises, Inc.
### Gross Revenue Report

| Office | MTB | Annual Premium | % GR | Guaranteed Ser Charge | % GR | Non-Guar Ser Charge | % GR | Non-Guar % Retained | % GR | Total YTD * Revenue |
|--------|-----|----------------|------|----------------------|------|---------------------|------|---------------------|------|---------------------|
| CE000066 | 18 | 52909.91 | 38.10 | 44710.89 | 32.20 | 21596.28 | 15.55 | 4764.89 | 3.43 | 138867.64 |
| CE000068 | 11 | 18988.10 | 14.00 | 38084.25 | 28.08 | 18815.95 | 13.87 | 14171.00 | 10.45 | 135624.26 |
| CE000074 | 7.0 | 6588.54 | 6.28 | 48327.86 | 46.09 | 41566.49 | 39.64 | 7938.93 | 7.57 | 104846.81 |
| *** Total *** | | | | | | | | | | |
| | | 6320035.21 | | 18961913.78 | | 13836192.10 | | 1144710.04 | | 42996987.99 |

\* Total YTD Revenue includes Verification fees

Exhibit "G"

# LIST OF STATE ADMINISTRATORS

<u>California</u>:

Gary S. Mendoza
Commissioner of Corporations
Department of Corporations
Suite 600
3700 Wilshire Boulevard
Los Angeles, California 90010
Telephone:  (213) 736-2741


<u>Connecticut</u>:

Cynthia Antanaitis
Assistant Director
Securities and Business Investment Division
Connecticut Department of Banking
260 Constitutional Plaza
Hartford, Connecticut 06103
Telephone:  (203) 240-8299


<u>Florida</u>:

Bob James
Senior Consumer Complaint Analyst
Department of Agriculture and Consumer Services
Division of Consumer Services
Mayo Building, Second Floor
Tallahassee, Florida  32399-0800
Telephone:  (904) 922-2770


<u>Hawaii</u>:

Mark Oyadomori
Securities Examiner
1010 Richards Street
Honolulu, Hawaii 96813
Telephone:  (808) 586-2722


<u>Illinois</u>:

Jim Ryan
Illinois Attorney General
500 South Second Street
Springfield, Illinois 62706
Telephone:  (217) 782-4465


C0625-024
59264.2

EXHIBIT "H"
H-1

<u>Indiana</u>:

Mary Ann Tippett
Chief Deputy Commissioner
Franchise Section
Indiana Securities Division
Secretary of State
Room E-111
302 W. Washington Street
Indianapolis, Indiana 46204
Telephone:  (317) 232-6685


<u>Iowa</u>:

Dennis Britson
Director of Regulated Industries Unit
Iowa Securities Bureau
Second Floor, Lucas State Office Building
Des Moines, Iowa  50319
Telephone:  (515) 281-4441


<u>Maryland</u>:

Peggy Jones
Franchise Examiner
Maryland Division of Securities
20th Floor
200 St. Paul Place
Baltimore, Maryland 21202
Telephone:  (410) 576-7042


<u>Michigan</u>:

Marilyn McEwen
Franchise Administrator
Consumer Protection Division
Antitrust and Franchise Unit
Michigan Department of Attorney General
670 Law Building
Lansing, Michigan 48913
Telephone:  (517) 373-7117


<u>Minnesota</u>:

Ann Hagestad
Franchise Examiner
Minnesota Department of Commerce
133 East Seventh Street
St. Paul, Minnesota 55101
Telephone:  (612) 296-6328

EXHIBIT "H"
H-2

<u>Nebraska</u>:

Sheila Cahill
Staff Attorney
Department of Banking and Finance
Suite 311
1200 N Street
P. O. Box 95006
Lincoln, Nebraska 68509
Telephone:  (402) 471-3445

<u>New York</u>:

Joseph J. Punturo
Assistant Attorney General
Bureau of Investor Protection and Securities
New York State Department of Law
23th Floor
120 Broadway
New York, New York 10271
Telephone:  (212) 416-8211

<u>North Dakota</u>:

Jocelyn Smith-Whittey
Franchise Examiner
Office of Securities Commissioner
Fifth Floor
600 East Boulevard
Bismarck, North Dakota 58505
Telephone:  (701) 328-4712

<u>Oregon</u>:

Cecil Monroe
Department of Consumer and Business Services
Division of Finance and Corporate Securities
Labor and Industries Building
Salem, Oregon 97310
Telephone:  (503) 378-4387

<u>Rhode Island</u>:

Thomas Corrigan
Chief Securities Examiner
Division of Securities
Suite 232
233 Richmond Street
Providence, Rhode Island 02903-4232
Telephone:  (401) 277-3048

<u>South Dakota</u>:

Joe Bjerke
Franchise Administrator
Division of Securities
c/o 118 West Capitol
Pierre, South Dakota 57501
Telephone:  (605) 773-4013


<u>Texas</u>:

Dorothy Wilson
Statutory Document Section
Secretary of State
P.O. Box 12887
Austin, Texas 78711
Telephone:  (512) 475-1769


<u>Utah</u>:

Francine A. Giani
Division of Consumer Protection
Utah Department of Commerce
160 East Three Hundred South
P. O. Box 45804
Salt Lake City, Utah 84145-0804
Telephone:  (801) 530-6601


<u>Virginia</u>:

Stephen W. Goolsby
Chief Examiner
State Corporation Commission
Ninth Floor
1300 E. Main Street
Richmond, Virginia 23219
Telephone:  (804) 371-9051


<u>Washington</u>:

Deborah Bortner
Administrator
Department of Financial
   Institutions
Securities Division
P.O. Box 9033
Olympia, Washington 98507-9033
Telephone:  (360) 902-8760

EXHIBIT "H"
H-4

<u>Wisconsin</u>:

James R. Fischer
Franchise Administrator
Securities and Franchise Registration
Wisconsin Securities Commission
111 West Wilson Street
P.O. Box 1768
Madison, Wisconsin 53701
Telephone:  (608) 266-8559

## LIST OF TERMINATED, CANCELED AND
## NON-RENEWAL FRANCHISEES

Columbia, South Carolina
Steve Stafford
Carlene Stafford
P.O. Box 11871
Columbia, South Carolina 29211
Telephone:  (803) 256-8457


Fayetteville, North Carolina
Don Madonia
1124 Pleasant Oak Drive
Fayetteville, North Carolina 28314


Gainesville, Florida
Devella Smith
P.O. Box 553
Gainesville, Florida 32602
Telephone:  (904) 338-0800


Memphis, Tennessee
Larry Price
P.O. Box 22506
Memphis, Tennessee 38122
Telephone:  (901) 327-0707


Miami, Florida
John Davis
P.O. Box 4249
Deerfield Beach, Florida 33442
Telephone: (561) 274-8900


New Orleans, Louisiana
Jeff Weldon
P.O. Box 19159
Birmingham, Alabama 35219
Telephone: (205) 945-1126


**EXHIBIT "I"**



# Memphis, TN

Metropolitan Statistical Areas

Includes the following counties.

1)   Crittenden, AR

2)   De Soto, MS

3)   Fayette, TN

4)   Shelby, TN

5)   Tipton, TN

"Exhibit A"

Arkansas



# Mississippi



# Tennessee



# PURCHASE AGREEMENT

**THIS AGREEMENT** made and entered into this **3rd** day of *April*, 1997, effective as of the end of business on March 31, 1997, by and between JOHN GOODYEAR, a resident of Memphis, Tennessee (hereinafter referred to as "Goodyear"), SUSAN PERLMUTTER, a resident of Memphis, Tennessee (hereinafter referred to as "Perlmutter"), and S & D HOLDINGS LLC, a Tennessee limited liability company with its principal office located in Memphis, Tennessee (hereinafter referred to as "S & D");

## W I T N E S S E T H :

**WHEREAS**, Goodyear and Perlmutter are each fifty percent (50%) members of SYNERGY OPERATING PARTNERS, LLC, a Tennessee limited liability company with its principal office located in Memphis, Tennessee (hereinafter referred to as "Synergy"), which owns the Checkcare Systems franchise rights for Memphis and the surrounding area;

**WHEREAS**, Goodyear has agreed to sell, convey, and transfer his fifty percent (50%) Membership Interest in Synergy to Perlmutter pursuant to an agreement dated March 8, 1997;

**WHEREAS**, Perlmutter owns a ninety-nine percent (99%) interest in S & D and has assigned her rights to acquire Goodyear's fifty percent (50%) Membership Interest in Synergy to S & D;

**WHEREAS**, S & D is a duly qualified Tennessee limited liability company which seeks to operate the Checkcare Systems franchise in the Memphis area; and

**WHEREAS**, S & D is willing to purchase Goodyear's fifty percent (50%) Membership Interest in Synergy in accordance with the terms contained herein.

**NOW, THEREFORE**, in consideration of the mutual rights, duties, and covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.    SALE OF MEMBERSHIP INTEREST.  Goodyear hereby agrees to assign, sell, convey, and otherwise transfer his Membership Interest in Synergy to S & D in consideration for the total payment of FORTY THOUSAND DOLLARS ($40,000.00), which shall be paid at Closing, subject, however, to the performance by Perlmutter and S & D of all the terms and conditions of this Purchase Agreement.

1

2.      CONSULTING FEE.  S & D shall pay to Goodyear the sum of TEN THOUSAND DOLLARS ($10,000) at Closing, as a consulting fee for services to be rendered to S & D.

3.      CLOSING.  Closing shall be held on April 3, 1997; provided, however, the effective time of sale will be as of the end of business on March 31, 1997.

4.      PROFITS/LOSSES FOR FIRST QUARTER 1997.  All profits and losses for the first quarter of 1997 will be allocated to the parties pursuant to their Membership Interests through the end of the first quarter.  Goodyear waives any right or entitlement to future distribution of profits generated by Synergy, including profits generated in the first quarter of 1997.

5.      OBLIGATION TO PRICE.  As of Closing, all debts owed by Synergy and guaranteed by Goodyear to SONDRA PRICE shall have been paid in full, and Goodyear will have no further liability or obligations to Sondra Price after the date of this Agreement.

6.      FIRST TENNESSEE OBLIGATION OF SYNERGY. As of Closing, Perlmutter shall exert her best efforts to cause Goodyear to be released from his guarantee of the debt owed by Synergy to First Tennessee Bank, and will, along with S &D, indemnify Goodyear from any and all liabilities owed by Synergy to First Tennessee Bank.

7.      EMPLOYMENT OF GOODYEAR.  The parties agree that Goodyear will continue to work for Synergy through April 25, 1997.  Goodyear will be compensated for such services at the same rate of pay as during the period prior to March 31, 1997; provided, however, Goodyear will not be compensated for weekdays not worked up through and including April 25, 1997.  During the period April 1, 1997, through April 25, 1997, Goodyear will be assisting the training of RICK BOALS (the new sales manager for the company), the initial training of Q&A software and application to TIM McCORMICK, in addition to attempting to increase the "new" premium generated for the month of April.

8.      REPRESENTATIONS OF GOODYEAR.  Goodyear hereby represents and warrants the following:

    a)  To the best of his knowledge and belief, Synergy is a Tennessee limited liability company which is authorized to engage in the check collection business pursuant to Tennessee law;

    b)  Goodyear owns a fifty percent (50%) Membership Interest in Synergy, none of his Membership Interest has been transferred to third parties, and, to the best of his

knowledge and belief, no one other than Goodyear and Perlmutter has a Membership Interest in Synergy;

c)  To the best of his knowledge and belief, the financial statements relied upon by S & D in connection with its purchase of Goodyear's Membership Interest fairly represent the financial position of Synergy;

d)  To the best of his knowledge and belief, there are no claims or pending lawsuits against Synergy which have not been previously disclosed to S & D or Perlmutter;

e)  Goodyear has no ownership interest in any of the assets used in the operation of the Synergy business, and Goodyear acknowledges that all such assets belong to Synergy;

f)  To the best of his knowledge and belief, all required tax filings have been made on a timely basis and all taxes owed by Synergy have been paid, other than those taxes accrued on the books of Synergy;

g)  Goodyear has no knowledge that any of the assets of the partnership, specifically including, but not limited to, the accounts receivable, are uncollectable, or are valued on the financial statements in an amount over their fair market value.

8.    NON-COMPETITION.  Goodyear agrees not to compete with Synergy within a 100-mile radius of the City of Memphis for a period of five (5) years from the date hereof.

9.    GENERAL.

a)  The laws of the State of Tennessee shall govern and be controlling in determining the validity, interpretation, and construction of this Agreement and in all questions relating to the performance and consummation thereof.

b)  This Agreement shall be binding upon and inure to the benefit of the parties and their heirs, personal representatives, successors, and assigns.

c)  Should any provision of this Agreement be declared invalid, void, or unenforceable by a court of competent jurisdiction, the validity and binding effect of any remaining portions shall not be affected, and the remaining portions of this Agreement shall remain in full force and effect as if this Agreement had been executed with such provision eliminated.

d)  No failure to enforce any term, condition, or provision of this Agreement shall operate as a waiver of such term, condition, or provision, or as a waiver of any other term, condition, or provision hereunder.

e)  This Agreement constitutes the entire and complete agreement between the parties hereto and all prior representations, statements, agreements, understandings, and warranties are merged into and superseded by this Agreement.

f)  No amendment or modification of this Agreement shall be valid unless the same be in writing and executed by each of the parties hereto.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

JOHN GOODYEAR

SUSAN PERLMUTTER

S & D HOLDINGS LLC

BY:

Susan Perlmutter, Chief Manager

4

061198

# CHECKCARE ENTERPRISES, INC.

## CHECKCARE SYSTEMS FRANCHISE AGREEMENT

FOR <u>Memphis, TN</u> MSA

C0625-024
58841.5